Joseph M. **MEIER**, Appellant,

v.

**STATE of Alaska, BOARD OF FISHERIES**, Appellee.

No. S–1704.

Supreme Court of Alaska.

July 10, 1987.

---

Richard M. Burnham, Findley & Burnham, Juneau, for appellant.

Larri Irene Spengler, Asst. Atty. Gen. and Ronald W. Lorensen, Acting Atty. Gen., Juneau, for appellee.

John W. Hendrickson, Anchorage, for amici curiae.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

MOORE, Justice.

Joseph Meier challenges the validity of 5 AAC 06.370(b), a Fish and Game regulation governing commercial sockeye salmon fishing in Bristol Bay. Meier is a commercial salmon fisherman who operates drift gillnet gear in Bristol Bay. The superior court entered summary judgment upholding the regulation.[1] We affirm.

Fish and Game regulations divide Bristol Bay into a number of fishing districts. 5 AAC 06.200. A commercial salmon fisherman must register in a district before he may fish there. 5 AAC 06.370(a). The regulation challenged in this appeal, 5 AAC 06.370(b), requires a salmon fisherman who wishes to transfer from one district to another to register in the new district at least 48 hours before transferring, and to cease fishing in any district during the 48–hour period.[2] The waiting period is not insignificant, since the typical sockeye salmon run lasts only about ten days.

The Board of Fisheries promulgated 5 AAC 06.370 in 1986. In so doing, the Board returned to a scheme it had relied on for many years. The Board deviated from the 48–hour waiting period for only one year, in 1985. Regulations effective during 1985 permitted a fisherman to transfer 24 hours after registering in a new district, and to fish in the original district during those 24 hours.

Commercial salmon fishermen may operate either set gillnet gear or drift gillnet gear in Bristol Bay. 5 AAC 06.330. Setnet fishermen work from shore, and generally remain at the same location throughout the season. Driftnet fishermen work exclusively from boats, and are by definition more mobile. Although some driftnetters confine their activities to one area of the Bay, others prefer to "follow the fish." The percentage of the total fish harvest achieved by setnetters depends on the number of driftnetters fishing offshore. If driftnetters saturate an area, few fish reach the beach where setnetters have an opportunity to catch them.

An obvious effect of the waiting period in 5 AAC 06.370(b) is to discourage mobility among Bristol Bay salmon fishermen. Because driftnetters are more mobile than setnetters, the waiting period burdens driftnetters more heavily.

There is no question that the Board of Fisheries complied with the Administrative Procedure Act in promulgating 5 AAC 06.-370(b). Accordingly, our inquiry on review is two-fold. First, we must consider whether the Board exceeded its statutory mandate in promulgating the regulation, either by pursuing impermissible objectives or by employing means outside its powers. Second, we must consider whether the regulation is reasonable and not arbitrary. *Kelly v. Zamarello*, 486 P.2d 906, 911 (Alaska 1971).

The Board of Fisheries' undisputed purpose in promulgating 5 AAC 06.370(b) was to "assist in maintaining the historic [pre-1985] harvest percentages between the setnet and drift gillnet fisheries." Meier argues that this objective is outside the Board's statutory mandate because it is not consistent with and reasonably necessary

---

1. Meier moved for a preliminary injunction to bar enforcement of the regulation while his suit for declaratory relief was pending. With the parties' agreement, the court treated the motion as a motion for summary judgment.

2. The regulation directs the Commissioner of the Department of Fish and Game to waive the 48–hour waiting period when continuous commercial fishing is allowed in a district. 5 AAC 06.370(f). At other times, the Commissioner may reduce the waiting period by announcement. 5 AAC 06.370(b).

to the purposes for which the Board was created. *Id.* We disagree.

The Alaska legislature created the Board of Fisheries "[f]or purposes of the conservation and development of the fishery resources of the state...." AS 16.05.221. We have previously held that the duty to conserve and develop fishery resources implies a concomitant power to allocate fishery resources among competing users. *Kenai Peninsula Fisherman's Co-op Ass'n v. State,* 628 P.2d 897, 903 (Alaska 1981).

In *Kenai Peninsula,* an association of commercial fishermen challenged a Board of Fisheries management policy for Upper Cook Inlet which established priorities for use between commercial and recreational fishermen. Like Meier, the association argued that establishing priorities among competing users was not related to conservation or development, and therefore was outside the Board's powers. We rejected the association's argument, reasoning that

> [t]he legislature established the Board for the purposes of conserving and developing fishery resources. The terms "conserving" and "developing" both embody concepts of utilization of resources. "Conserving" implies controlled utilization of a resource to prevent its exploitation, destruction, or neglect. "Developing" connotes management of a resource to make it available for use. If the Board is going to accomplish its designated purposes, it is necessarily going to make decisions concerning utilization of the resources it is charged with managing.

628 P.2d at 903 (footnote omitted). We went on to hold that the Board's power to control resource utilization permitted it to establish priorities for use between commercial and recreational fishermen as a response to sharp competition between the two groups for a limited fishery resource. *Id.*

■ Competition between setnet and driftnet fishermen for Bristol Bay sockeye salmon is equally keen, and our reasoning in *Kenai Peninsula* is equally applicable. Therefore, we hold that the Board's power to control fishery resource utilization allows it to allocate the salmon harvest between these two competing subgroups of commercial users.

Not only was the Board's purpose in promulgating 5 AAC 06.370(b) permissible, but the means it employed were within its powers. Alaska Statute 16.05.251(a)(11) explicitly vests power in the Board to adopt regulations it considers advisable for "establishing the times and dates during which the issuance of fishing licenses, permits and registrations and the transfer of permits and registrations between registration areas is allowed."[3]

■ In considering whether 5 AAC 06.-370(b) is arbitrary or unreasonable, this court's task is simply to determine whether the regulation is reasonably related to its goal of allocating the salmon harvest between driftnet and setnet fishermen. We have no authority to substitute our own judgment for the Board of Fisheries', particularly since highly specialized agency expertise is involved. "The 'wisdom' of the regulation is not a subject of review." *Kingery v. Chapple,* 504 P.2d 831, 835 (Alaska 1972).

The Board reasoned that "[r]eimposing and improving the enforceability of the 48-hour waiting period will assist in slowing down the movement of the more mobile component of the drift gillnet fishery which will spread out the harvest more evenly among all participants promoting a more orderly fishery and enhancing economic stability as a whole." Bristol Bay's experience during 1985 provides a sound basis for this conclusion.

Apparently as a result of eliminating the waiting period, the number of fishermen transferring between districts dramatically increased during the 1985 season. The number of transfers effected through the King Salmon Fish and Game office, for example, rose from an eleven-year average

---

**3.** AS 16.05.251 was amended in June, 1986. Prior to that time, this subsection was numbered AS 16.05.251(a)(12).

of 945 to 3,876 in 1985. The number effected through the Dillingham office rose from a nine-year average of 403 to 957.

At the same time, setnetters' share of the total Bristol Bay salmon harvest fell from a pre–1985 average of 11% to 9%.[4] Setnetters fared worst in the Egegik and Ugashik districts of Bristol Bay, where salmon runs were especially strong. A Fish and Game biologist reported that fleet sizes in those districts "vastly exceeded historic peak levels while other districts' effort decreased accordingly." In Egegik, setnetters' share of the total harvest fell from a ten-year average of 15% to 6%. In Ugashik, their share fell from 11% to 3%. Not surprisingly, "[d]iscontent among the setnet communities at both Egegik and Ugashik increased due to increased competition for fish in both districts."[5]

We cannot say whether returning to a more restrictive regulation governing transfer is the best or most efficient way to protect setnetters' historic share of the salmon harvest. But the record shows that deviating from the 48–hour rule in 1985 altered the allocation of the harvest in a specific way. If the Board's goal was to restore the pre–1985 allocation, then returning to the 48–hour rule was clearly a reasonable approach.

We are convinced that 5 AAC 06.370(b) is consistent with and reasonably necessary to the conservation and development of Alaska fishery resources, and therefore that the Board of Fisheries acted within its mandate in promulgating the regulation. We are further convinced that the regulation is reasonable and not arbitrary. Accordingly, the superior court is AFFIRMED.

---

**4.** Setnetters' share of the harvest was 9% during 1965–1974 and 12% during 1975–1985, a twenty-year weighted average of 11%. Setnetters' share during 1983 and 1984 was 10%.

**5.** By contrast, setnetters in districts with weak salmon runs appear to have benefitted under the 1985 regulation. As large numbers of drift-netters left those districts in search of stronger runs, the setnetters took a larger share of what fish there were. In Naknek-Kvichak, setnetters' share of the total harvest rose from a ten-year average of 10% to 12% in 1985. In Nushagak, their share rose from 17% to 30%; in Togiak, from 17% to 24%.