TONGASS SPORT FISHING ASSOCIA-
TION; Ketchikan Marine Charters As-
sociation; Southeastern Lodge & Resort
Owners Association; Sitka Charter Boat
Owners Association; Petersburg Char-
ter Boat Association; Sitka Sportsman's
Association; Juneau Charter Boat Oper-
ator's Association; Alaska State Council
of Trout Unlimited; and Alaska Sport
Fishing Federation, Appellants,

v.

STATE of Alaska; Alaska Board of Fish-
eries; Alaska Department of Fish &
Game; and Carl L. Rosier, Commission-
er of Fish & Game, Appellees.

Alaska Trollers Association,
Appellee/Intervenor.

No. S–5202.

Supreme Court of Alaska.

Jan. 14, 1994.

James R. Blair, Bliss Riordan, Fairbanks, for appellants.

John P. Griffin, Asst. Atty. Gen., Charles E. Cole, Atty. Gen., Juneau, for appellees.

Bruce B. Weyhrauch, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellee/intervenor.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal concerns a regulation promulgated by the Alaska Board of Fisheries (the Board) allocating the number of chinook (king) salmon that may be harvested by commercial seiners and gillnetters, commercial trollers, and sport fishers in southeast Alaska. This appeal presents three questions. First, does the allocative regulation promulgated by the Board violate the policies expressed in Article VIII of the Alaska Constitution? Second, in promulgating this regulation, did the Board consider the relevant criteria and take a "hard look" at the salient problems involved? Third, is a decisional document supporting the regulation required, and if not, is the record sufficient to support the Board's adoption of the regulation? We determine that the superior court answered all three of these questions correctly, and affirm its grant of summary judgment to the Board.

## I. BACKGROUND

The Pacific Salmon Treaty took effect in 1985. *See* Fisheries: Pacific Salmon, Treaty Between the United States of America and Canada, Jan. 28, 1985;[1] 16 U.S.C. §§ 3631–3644. Since its enactment the number of chinook salmon that can be harvested in southeast Alaska by commercial net fishers (seiners and gillnetters), commercial trollers, and sport fishers, has been determined by the Pacific Salmon Commission under the terms of the treaty. For 1991 and 1992 the Commission set a harvest ceiling of 273,000 and 263,000 chinooks respectively for all user groups. Alaska Dep't of Fish and Game, *Regional Information Report No. 1J92–01, Chinook Salmon Fisheries and Harvests in Southeast Alaska* 2–3 (1992).[2]

---

1. *See generally* Thomas C. Jensen, *The United States–Canada Pacific Salmon Interception Treaty: An Historical and Legal Overview*, 16 Envtl.L. 363, 366 n. 1 (1986).

2. Alaska hatchery chinook may be taken in addition to these base ceilings. Cumulative deviations from the harvest ceilings are limited to 7.5% of the ceiling or approximately 20,000 fish. When cumulative deviations exceed this management range, chinook harvests must be reduced

The Alaska Board of Fisheries determines allocations among the user groups under the chinook harvest ceilings set by the Pacific Salmon Commission. Twenty thousand chinook a season are allocated to the commercial net fishers. 5 Alaska Administrative Code (AAC) 33.365(b)(10). Prior to 1992 sport fishers were able to harvest chinook subject only to bag and size limitations. The remaining chinook, under the provisions of the Pacific Salmon Treaty, were available for harvest by commercial trollers.[3]

Alaska Department of Fish and Game data show that the sport fishers' catch of chinook gradually increased until the Board imposed ceilings.[4] This increased sport harvest in combination with lower Treaty limits reduced the number of chinook available to southeast commercial trollers. From 1975 to 1979 the average harvest of Treaty chinook by commercial trollers was approximately 300,000 fish. From 1985 to 1991, it was less than 225,000 fish.[5]

In November 1991, the Alaska Trollers Association requested that the Board amend 5 AAC 33.365 (the Southeast Alaska–Yakutat Chinook and Coho Salmon Troll Fisheries Management Plan) to allocate a percentage of the Treaty chinook salmon quota to commercial trollers. After four days of public hearings and lengthy deliberations, the Board voted to allocate Treaty chinook between the commercial troll and sport fisheries. After deducting the 20,000 chinook allocated to the commercial net fishers, 83 percent of the remainder was allocated to the troll fishery and 17 percent to the sport fishery. Subsequently the Board adopted regulations implementing its allocation decision:

(a) The department shall manage the Southeast Alaska Area and Yakutat Area chinook salmon sport fisheries in marine waters so that these fisheries together harvest not more than 17 percent of the annual harvest ceiling, specified by the Pacific Salmon Commission, after the commercial net harvest specified in 5 AAC 33.-365(b)(10) is subtracted from the total ceiling. The management plan in this section provides the department with guidelines for preseason and in-season adjustment of sport fishery harvest levels in order to not exceed the 17 percent ceiling.

(b) The objects of the management plan in this section are to allow uninterrupted sport fishing in marine waters for chinook salmon, while not exceeding the 17 percent ceiling established in (a) of this section, and to minimize regulatory restrictions on anglers not fishing from a charter vessel, who harvest chinook salmon at a lower catch-per-unit of effort than do anglers fishing from a charter vessel.

5 AAC 46.055(a)-(b).

Thereafter, the Tongass Sport Fishing Association, together with other sport fishing organizations, associations of charter-boat operators, and an association of lodge and resort owners (collectively Tongass) brought suit challenging the Board's regulation.[6] On cross-motions for summary judgment the superior court ruled that (1) the Board did not violate the Administrative Procedure Act in adopting the questioned regulation; (2) the Board acted within its statutory powers regarding conservation, development, and utilization of fishery resources; (3) the Board took a hard look at all relevant factors in making the allocation; (4) the allocation regulation does not violate article VIII of the

the following year to bring the cumulative deviation back within the management range. *Id.*

**3.** The commercial trollers were limited each year to what was left after subtracting from the Treaty's annual harvest ceiling the following: (1) the allocation to the net fishermen; (2) a pre-season projection of what sport fishermen would catch that year; and (3) the amount, if any, by which the previous year's harvest of chinook by all user groups exceeded that year's Treaty ceiling.

**4.** The sport fishers' harvest of Treaty chinook—chinook not raised in hatcheries—grew steadily

during this time. In 1969, it was 14,000. Between 1973 and 1979, it hovered between 16,000 and 17,000. For most years from 1980 to 1988, it was approximately 20,000. Thereafter, it increased more rapidly. It was 24,720 in 1989, 34,588 in 1990, and 41,700 in 1991.

**5.** Trollers harvested 88–90% of the total Treaty chinook catch prior to 1980. The trollers' harvest from 1989 through 1992 was less than 80% of the total catch.

**6.** The Alaska Trollers Association intervened in support of the Board's regulation.

Alaska Constitution; and (5) a decisional document was not necessary because the administrative record adequately set forth the basis of the Board's allocation decision. Tongass appeals, challenging the last three of those rulings.

## II. DOES THE BOARD'S ALLOCATION REGULATION VIOLATE THE POLICIES EXPRESSED IN ARTICLE VIII OF THE ALASKA CONSTITUTION? [7]

■ Tongass argues that article VIII of the Alaska Constitution, particularly the "common use" clause of section 3 and the "no exclusive right of fishery" clause of section 15, embodies a clear policy in favor of general public access to the natural resources of the state, with no special privilege accorded to any individual group.[8] Tongass further argues that under the public trust doctrine the state has a fiduciary duty to manage the resources of Alaska for the benefit of all of the people.[9] Given these constitutional policies, Tongass takes the position that allocating a fixed quota of chinook to the trollers creates an unconstitutional "special privi-

lege." [10] In Tongass's view, if the regulation is allowed to stand, "it will severely impact the ability of the vast majority of members of the general public to fish for and catch king salmon."

The Board of Fisheries was created for the purposes of conservation and development of the state's fishery resources. AS 16.05.-221(a). In *Kenai Peninsula Fisherman's Cooperative Ass'n v. State*, 628 P.2d 897, 903 (Alaska 1981), we held that concepts of "conserving" and "developing" fishery resources necessarily include the concepts of managed utilization and thus allocation of these resources. *See also Alaska Fish Spotters v. State, Dep't of Fish & Game*, 838 P.2d 798, 800 (Alaska 1992). In *Meier v. State, Board of Fisheries*, 739 P.2d 172, 174 (Alaska 1987), we stated that the Board's "duty to conserve and develop fishery resources implies a concomitant power to allocate fishery resources among competing users." We also held that the Board's authority encompasses the power to allocate a fishery resource between two competing subgroups of commercial users. *Id.* at 174 (upholding Board allocation of

---

7. Whether a regulation is consistent with the Alaska Constitution is a question of law, which we review *de novo*. *See, e.g., Sonneman v. Knight*, 790 P.2d 702, 704 (Alaska 1990). "[S]ummary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Thus, we review *de novo* an order granting summary judgment." *Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391, 394 (Alaska 1990) (citation omitted).

8. Article VIII, section 1 of the Alaska Constitution provides:

It is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest.

Article VIII, section 2 provides:

The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people.

Article VIII, section 3 provides:

Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

Article VIII, section 4 provides:

Fish, forests, wildlife, grasslands, and all other replenishable resources belonging to the

State shall be utilized, developed, and maintained on the sustained yield principle, subject to preferences among beneficial uses.

Article VIII, section 15 provides:

No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.

Article VIII, section 17 provides:

Laws and regulations governing the use or disposal of natural resources shall apply equally to all persons similarly situated with reference to the subject matter and purpose to be served by the law or regulation.

9. *See Owsichek v. State, Guide Licensing & Control Bd.*, 763 P.2d 488, 495 (Alaska 1988); *CWC Fisheries, Inc. v. Bunker*, 755 P.2d 1115, 1117–18 (Alaska 1988).

10. Troll fleet participation is controlled through the limited entry program. AS 16.43.010–.990; *see Rutter v. State*, 668 P.2d 1343 (Alaska 1983); *State v. Ostrosky*, 667 P.2d 1184 (Alaska 1983), *appeal dismissed sub nom. Ostrosky v. Alaska*, 467 U.S. 1201, 104 S.Ct. 2379, 81 L.Ed.2d 339 (1984).

salmon between setnet and driftnet fishers). Subsequently, in *Gilbert v. State, Department of Fish & Game,* 803 P.2d 391, 399 (Alaska 1990), we recognized that the Board possessed authority to allocate among different fisheries.

■ We have held that the "common use" clause of article VIII, section 3, the "no exclusive right of fishery" clause of section 15, and the "uniform application" clause of section 17 are not implicated unless limits are placed on the admission to resource user groups. *McDowell v. State,* 785 P.2d 1, 8 & n. 14 (Alaska 1989); *see also Owsichek v. State, Guide Licensing & Control Bd.,* 763 P.2d 488, 492 (Alaska 1988). Article VIII limitations on the state's power to restrict access to natural resource user groups do not apply to the state's authority to allocate fishery resources among sport, commercial, and subsistence users.[11] In *Kenai Peninsula,* we said:

> While section 15 does prohibit granting monopoly fishing rights, that section was not meant to prohibit differential treatment of such diverse user groups as commercial, sports, and subsistence fishermen. To conclude that, because a certain species is made available for sport fishing in a given area, commercial fishing of the same species in the same area must also be allowed, would be to go far beyond the purpose of the section.

628 P.2d at 904.

■ On the basis of these authorities we conclude that the Board possessed the authority to allocate Treaty chinook between sport and commercial users. The Board's allocation decision was not a limitation on admission to a particular user group. Therefore, we hold that the regulation is not violative of the "common use" or "no exclusive right of fishery" clauses of article VIII of the Alaska Constitution.

___

**11.** In *McDowell* we said, "The state may, indeed must, make allocation decisions between sport, commercial, and subsistence users. That authority, however, does not imply a power to limit admission to a user group." 785 P.2d at 8.

**12.** Alaska Statute 16.05.251(e) provides in part:

■ Furthermore, the regulation does not conflict with the "uniform application" clause of article VIII. Since sport and commercial users are not similarly situated, the uniform application clause is not implicated. *Gilbert,* 803 P.2d at 399.

III. *IN PROMULGATING THE REGULATION, DID THE BOARD CONSIDER RELEVANT CRITERIA AND TAKE A "HARD LOOK" AT THE CONFLICTING FACTORS IN MAKING ITS ALLOCATION DECISION?*

The legislature has authorized the Board to adopt regulations that the Board considers advisable for "regulating commercial, sport, guided sport, subsistence, and personal use fishing as needed for the conservation, development, and utilization of fisheries." AS 16.05.251(a)(12). The legislature also directed the Board to establish criteria for the allocation of fishery resources among personal use, sport, and commercial fishing. AS 16.05.251(e).[12] The legislature further provided that such criteria may include factors such as

(1) the history of each personal use, sport, guided sport, and commercial fishery;

(2) the number of residents and nonresidents who have participated in each fishery in the past and the number of residents and nonresidents who can reasonably be expected to participate in the future;

(3) the importance of each fishery for providing residents the opportunity to obtain fish for personal and family consumption;

(4) the availability of alternative fisheries resources;

(5) the importance of each fishery to the economy of the state;

(6) the importance of each fishery to the economy of the region and local area in which the fishery is located;

The Board of Fisheries may allocate fishery resources among personal use, sport, guided sport, and commercial fisheries. The board shall adopt criteria for the allocation of fishery resources and shall use the criteria as appropriate to particular allocational decisions.

(7) the importance of each fishery in providing recreational opportunities for residents and nonresidents.

*Id.* In response to this legislation the Board adopted 5 AAC 75.017:

Before adopting regulations that allocate fish among personal use, sport, and commercial fisheries, the board will, as appropriate to particular allocation decisions, *consider* factors such as those set out in AS 16.05.251(e).

(Emphasis added).

Tongass asserts that the Board failed to follow the criteria set out in AS 16.05.251(e) and 5 AAC 75.017 in adopting its allocational regulation. The essence of Tongass's argument is that although the Board members were aware of the relevant criteria, and some members did mention criteria from time to time, there is no indication in the record that the Board ever weighed the criteria in making its allocation decision. As Tongass notes, an agency must at least consider all relevant criteria. *See State, Dep't of Transp. & Pub. Facilities v. 0.644 Acres, More or Less,* 613 P.2d 829, 833 n. 13 (Alaska 1980).

▮ Upon its review of the transcript of the four-day hearing and the Board's deliberations, the superior court found that the Board had considered the relevant statutory criteria. Review of the record leads us to the same conclusion. The record shows that during a full day of deliberations following the hearings the Board did consider the relevant criteria before reaching its allocation decision.

▮ In making its allocation decision the Board was required to take a "hard look" at the salient problems and to engage in reasoned decisionmaking. *Gilbert,* 803 P.2d at 398; *Trustees for Alaska v. State, Dep't of Natural Resources,* 795 P.2d 805, 809 (Alaska 1990); *Alaska Survival v. State, Dep't of Natural Resources,* 723 P.2d 1281, 1287 (Alaska 1986). Our review of the record persuades us that the Board did take a hard look at the salient problems affecting the southeast Treaty chinook harvests and en-

gaged in reasoned decisionmaking in reaching its allocation decision. There is no evidence that the Board's allocation was unreasonable or arbitrary. It is not our function to examine the wisdom of the allocation regulation. *Gilbert,* 803 P.2d at 397; *Meier,* 739 P.2d at 174.

IV. *IS A DECISIONAL DOCUMENT RE-QUIRED? IF NOT, IS THE REC-ORD SUFFICIENT TO SUPPORT THE BOARD'S ALLOCATION DECI-SION?*

▮ Tongass asks us to invalidate the Board's allocation regulation because the Board did not publish a decisional document in its support. Effective judicial review requires that an agency adequately discuss the basis of a regulation:

For a court to determine that an agency acted within its authority in adopting a regulation, it is vital that the agency clearly voice the grounds upon which the regulations was based in its discussions of the regulations or in a document articulating its decision.

*Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game,* 838 P.2d 798, 801 (Alaska 1992).

We have expressly held that decisional documents are not required in the circumstances where an agency exercises its rulemaking powers. *Johns v. Commercial Fisheries Entry Comm'n,* 758 P.2d 1256, 1260–61 (Alaska 1988); *see also State v. Hebert,* 743 P.2d 392, 396–97 (Alaska App.1987). We are not persuaded by Tongass's arguments that we should modify *Johns* to require a decisional document from an administrative agency when it exercises its (quasi-legislative) rulemaking authority. As noted in the previous section, the record in this case indicates that the Board took a hard look at the relevant and often competing salient factors in making its allocation decision and that its decision reflects reasoned decisionmaking. Adoption of a decisional document requirement is unnecessary and would impose significant burdens upon the Board.[13]

13. As the state notes:

These Boards are citizen boards, whose members generally pursue full-time careers in addi-

The superior court's grant of summary judgment to the state is **AFFIRMED.**

tion to their agency obligations; the number of meetings they can hold and proposals they can consider are limited. Nevertheless, in its 1990–91 meeting cycle, the Board of Fisheries met for 58 days and considered approximately 393 proposals to change or adopt new regula-

tions. Current limitations in staff, in agency budgets, and in the time commitments of lay Board members make it impossible to reduce every one of these hundreds of decisions to a written "findings and conclusions" document.