**Sigurd RUTTER, Appellant,**

v.

**STATE of Alaska, Alaska Board of Fisheries, Alaska Department of Fish and Game, and Frank Rue, Commissioner, Department of Fish and Game, Appellees.**

No. S–7729.

Supreme Court of Alaska.

Aug. 7, 1998.

Sheila Bacchus, Sitka, for Appellant.

Steven A. Daugherty, Assistant Attorney General, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before MATTHEWS, C.J., and COMPTON, EASTAUGH, FABE and BRYNER, JJ.

*OPINION*

PER CURIAM.

In 1992 the Alaska Board of Fisheries (Board) allocated to the sports fishery 17% of the treaty chinook (king) salmon harvestable in southeast Alaska; the ·Board allocated 83% to the commercial troll fishery.[1] *See* 5 Alaska Administrative Code (AAC) 46.055(a) (repealed 1994). This court subsequently upheld the allocation, finding it neither unreasonable nor arbitrary. *See Tongass Sport Fishing Ass'n v. State,* 866 P.2d 1314, 1319 (Alaska 1994). In January 1994, after three days of public testimony and a full day of deliberations, the Board adopted a new regulation, 5 AAC 47.055(a) (am.5/2/97). That regulation reallocated from the commercial troll fishery to the sport fishery—over a three-year period—3% of the harvestable treaty salmon, thereby giving the sport fishery 20% and the commercial fishery 80%. The sport fishery category includes guided and unguided sport fishing. *See* AS 16.05.940(5), (29).

Sigurd Rutter, a commercial troll fisherman in Sitka, filed suit in June 1994, challenging the newly adopted regulation.[2] The State· filed a motion for summary judgment; Rutter filed a cross-motion. On March 21, 1996, Superior Court Judge Larry C. Zervos issued a decision addressing the opposing motions, concluding that the reallocation regulation was reasonable and valid, and granting summary judgment in favor of the State.

---

1. Under the Pacific Salmon Treaty, the Pacific Salmon Commission determines the maximum number of chinook salmon that may be harvested in southeast Alaska. *See Tongass Sport Fishing Ass'n v. State,* 866 P.2d 1314, 1315 (Alaska 1994). The Commission set the harvest ceiling for all user groups in southeast at 273,000 in 1991 and at 263,000 in 1992. Alaska currently uses the 1992 ceiling as its harvest guideline.

2. Rutter also challenged the validity of 5 AAC 39.270(h)(4) (defining "downrigger"). On appeal, Rutter has abandoned his challenge to that regulation.

Rutter appeals. Although the particulars of Rutter's arguments differ somewhat from the arguments he raised below, the core of his complaint remains the same: "This is a little case with a big issue: ... how can the State redistribute scarce chinook resources between commercial and non-commercial groups when the non-commercial group includes resource users with commercial interests?"

For the reasons stated in Judge Zervos's thorough and thoughtful summary judgment decision, relevant portions of which we set out in Appendix A, we affirm the superior court's order upholding the validity of 5 AAC 47.055(a). We add the following with respect to points specifically raised on appeal:

1. We reject Rutter's contention that the superior court erred in granting summary judgment because genuine issues of material fact had been raised concerning the Board's failure to determine "the extent of the commercial interest" of the guided sport fishery. Below, Rutter repeatedly acknowledged that there were no disputed facts for trial and that the case could be disposed of on summary judgment. He pointed to no information that the Board had refused to consider. Although Rutter mentioned certain 1994–95 registration statistics that he thought relevant, there is no indication that these statistics, standing alone, would have raised genuine issues of material fact. Rutter made no specific offer of additional admissible evidence concerning the extent of the commercial interest of the guided sport fishery. Our review of the record discloses no genuine issue of material fact for trial. Summary judgment was appropriate under these circumstances. *See Trigg v. City of Nome,* 929 P.2d 1273, 1274 n. 1 (Alaska 1996).

2. For similar reasons, we reject Rutter's claim that the reasonableness of the Board's decision to classify guided sport fishing as a form of sport fishing rather than as a form of commercial fishing presented a question of disputed legislative fact for trial. No disputed facts bore on this determination.[3]

3. We find no merit in Rutter's contention that the Board was required to consider the criteria listed in AS 16.05.251(e) separately as they related to the guided and unguided sport fisheries. The Board must consider the criteria listed when it decides to allocate fish among fisheries. *See Peninsula Mktg. Ass'n v. State,* 817 P.2d 917, 921 (Alaska 1991); 5 AAC 39.205, 75.017 (1996). The Board "may" allocate the resources "among personal use, sport, guided sport, and commercial" fisheries. AS 16.05.251(e). But it need not; the provision's use of the permissive word "may," indicates that the Board has discretion to treat sport and guided sport fishing as separate categories for allocation purposes. Here, after taking a "hard look" at the subject, the Board decided against separate allocations for sport fishing, on the one hand, and guided sport fishing, on the other. Instead, it elected to treat guided and unguided sport fishing as a single category and to make a separate allocation to the commercial trolling fishery. *See* 5 AAC 47.055(a), (n). The Board fully considered the statutory criteria in relation to the two categories adopted in the allocation—sport and commercial; in so doing, it fully discharged its obligations under AS 16.05.251(e).

The judgment entered by the superior court is AFFIRMED.

---

**3.** To the extent that Rutter suggests that the reasonableness of the Board's decisions always presents an issue of fact that is immune from summary judgment, he is incorrect. The role of the court in deciding whether the Board's decision was reasonable is limited to determining whether the Board "[took] a 'hard look' at salient problems and ... engage[d] in reasoned decisionmaking." *Tongass,* 866 P.2d at 1319 (citing *Gilbert v. State, Dep't of Fish & Game,* 803 P.2d 391, 398 (Alaska 1990)). "It is not our function to examine the wisdom of the allocation regulation." *Id.* Under this standard, when no facts material to the Board's decision are disputed, the ultimate issue of reasonableness presents a question of law capable of summary adjudication. *Cf. Holloway v. Pigman,* 884 F.2d 365, 366 (8th Cir.1989) ("The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."); *Center for Auto Safety v. Bowers,* 466 F.Supp. 829, 835 (D.D.C.1979) (holding that, where sufficient evidence is before an agency, a court may find a regulation reasonable as a matter of law on summary judgment). We decline Rutter's invitation to adopt a more stringent standard of review in cases involving the allocation of scarce environmental resources, since Rutter raises this issue for the first time in his reply brief.

*APPENDIX A* *

## ORDER GRANTING SUMMARY JUDGMENT

The State of Alaska, Department of Fish and Game ("the State") moves for summary judgment on all issues raised in Mr. Rutter's complaint. Mr. Rutter opposes and cross-moves for summary judgment.

. . . .

### III. *VALIDITY OF THE REGULATIONS* [1]

In deciding the validity of the regulations, this court must give substantial deference to the actions of the Board. *See Stepovak–Shumagin Set Net Ass'n v. State, Bd. of Fisheries,* 886 P.2d 632, 636 (Alaska 1994); *see also State v. Kenaitze Indian Tribe,* 894 P.2d 632, 641 (Alaska 1995).

[W]here an administrative regulation has been adopted in accordance with the procedures set forth in the Administrative Procedure Act, and it appears that the legislature has intended to commit to the agency discretion as to the particular matter that forms the subject of the regulation, we will review the regulation in the following manner: First, we will ascertain whether the regulation is consistent with and reasonably necessary to carry out the purposes of the statutory provisions conferring rule-making authority on the agency. This aspect of review insures that the agency has not exceeded the power delegated by the legislature. Second, we will determine whether the regulation is reasonable and not arbitrary.

*Stepovak–Shumagin,* 886 P.2d at 636–37 (quoting *Kelly v. Zamarello,* 486 P.2d 906, 911 (Alaska 1971)). The court must not sub-stitute its judgment for the Board's determination because " 'highly specialized agency expertise is involved.' " *Id.* at 637 (quoting *Meier v. State, Bd. of Fisheries,* 739 P.2d 172, 174 (Alaska 1987)). The court should not question the wisdom of the regulations, but rather must "ensure only that the agency has taken a 'hard look' at the salient problems and has 'genuinely engaged in reasoned decision making.' " *Id.* (quoting *Gilbert v. State Dep't of Fish & Game,* 803 P.2d 391, 398 (Alaska 1990)).

The legislature created the Board "[f]or the purposes of the conservation and development of the fishery resources of the state." AS 16.05.221(a). The Supreme Court has held that the Board, in serving the purposes of conservation and development, is necessarily going to have to make decisions regarding the utilization of the fishery resources. *See Kenai Peninsula Fisherman's Coop. Ass'n. v. State,* 628 P.2d 897, 903 (Alaska 1981).

Thus, in determining the validity of a regulation adopted by the Board, the court must first determine whether the regulation is reasonably necessary to conserve and develop the fisheries resource. If the regulation is reasonably necessary for these purposes, then the court must determine whether the regulation, as adopted, is reasonable and not arbitrary.

### A. *The 3% Reallocation Regulation*

The legislature has granted the Board the power to adopt regulations that it deems advisable for " 'regulating commercial, sport, guided sport, subsistence, and personal use fishing as needed for the conservation, development, and utilization of fisheries.' " *Tongass Sport Fishing Ass'n v. State,* 866 P.2d 1314, 1318 (Alaska 1994) (quoting AS 16.05.251(a)(12)). This rule-making power

* As reprinted in this Appendix, the superior court's summary judgment order has been redacted to delete extraneous discussion. The original labeling of the section headings of the superior court order has been retained, but footnotes and pages have been renumbered. The order has also been technically edited in accordance with this court's Manual of Technical Rules for publication.

1. Mr. Rutter does not argue that the regulations were adopted in violation of the Administrative Procedure Act. Therefore, this court presumes that, in adopting the regulations, the Board followed the proper procedure. *See* AS 44.62.100 ("The filing of a certified copy of a regulation . . . raises the rebuttable presumption[ ] that . . . all requirements of [the Administrative Procedure Act] and the regulations relative to the regulation have been complied with."); *Gilbert v. State, Dep't of Fish & Game,* 803 P.2d 391, 394 (Alaska 1990) ("A regulation . . . is considered procedurally presumptively valid once a certified copy has been filed.").

includes the authority to allocate fishery resources between sport, subsistence, and commercial users. *See Peninsula Mkg. Ass'n v. State*, 817 P.2d 917, 921 (Alaska 1991). It also includes the power to allocate resources between users in the same group. *See id.* at 920–21.

In this case, the 3% allocation regulation is an allocative decision between the sport fishery and the commercial troll fishery. Allocative decisions are reasonably necessary to conserve and develop the resource. *See Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174–75 (Alaska 1987). Therefore, the question presented is whether the 3% reallocation regulation was reasonable and not arbitrary.

As already noted, the court's role is not to question the wisdom of a particular regulation, but rather to ensure that the Board has taken a "hard look" at the relevant problems and has actually engaged in reasoned decision making. *Stepovak–Shumagin*, 886 P.2d at 637. In making allocative decisions, however, the Board must consider criteria such as the following:

(1) the history of each personal use, sport, guided sport, and commercial fishery;

(2) the number of residents and nonresidents who have participated in each fishery in the past and the number of residents and nonresidents who can reasonably be expected to participate in the future;

(3) the importance of each fishery for providing residents the opportunity to obtain fish for personal and family consumption;

(4) the availability of alternative fisheries resources;

(5) the importance of each fishery to the economy of the state;

(6) the importance of each fishery to the economy of the region and local area in which the fishery is located;

(7) the importance of each fishery in providing recreational opportunities for residents and nonresidents.

AS 16.05.251(e); *see* 5 AAC 75.017 (1996) ("Before adopting regulations that allocate fish among personal use, sport, and commercial fisheries, the board will, as appropriate to particular allocation decisions, consider factors such as those set out in AS 16.05.251(e).").

In order to evaluate whether the Board's actions in adopting the 3% reallocation regulation were reasonable and not arbitrary, the court must briefly discuss the Pacific Salmon Treaty and the Board's initial decision to allocate king salmon between the commercial troll and sport fisheries. The Pacific Salmon Treaty between the United States and Canada, which took effect in 1985, limited the number of king salmon that may be taken by all users in Southeast Alaska. *See Tongass Sport Fishing Ass'n*, 866 P.2d at 1315. The treaty set the harvest ceiling of king salmon in Southeast in 1991 at 273,000 and in 1992 at 263,000. Treaty Between the Government of Canada and the Government of the United States of America Concerning Pacific Salmon, Jan. 25, 1985, U.S.-Can., annex 4, ch.3, § 1(e), T.I.A.S. No. 11091 [hereinafter Pacific Salmon Treaty]; *Tongass Sport Fishing Ass'n*, 866 P.2d at 1315. Subsequent harvest ceilings are to be set based on the recommendations of the Pacific Salmon Commission, the implementing body for the Pacific Salmon Treaty. Alaska has been using the 1992 ceiling of 263,000 king salmon as its harvest guideline.[2]

Prior to 1992, the Board did not allocate the treaty salmon between the commercial troll fishery and the sport fishery on a percentage basis. *See Tongass Sport Fishing Ass'n*, 866 P.2d at 1316. Instead, sport fishers were able to harvest treaty salmon subject only to bag limits and size restrictions. *See id.* Commercial troll fishers were able to harvest the number of fish left each year after subtracting from the annual harvest ceiling the following: (1) 20,000 fish for the commercial net fishermen; (2) the pre-season projection of the number of fish the sport fishers would take that year; and (3) the number of fish, if any, by which the previous

**2.** The issue of whether Alaska has violated the Pacific Salmon Treaty by failing to reduce its total king salmon harvest in Southeast below the 263,000 ceiling is being litigated in the federal courts. *See Confederated Tribes & Bands of the Yakama Nation v. Baldrige*, 898 F.Supp. 1477 (W.D.Wash.1995).

year's king harvest by all user groups exceeded that year's harvest ceiling. *See id.* at 1316 n. 3. In 1992, the Board changed this procedure by allocating 17% of the treaty salmon to the sport fishery and 83% to the commercial troll fishery, after first subtracting 20,000 fish for the commercial net fishers. *See id.* at 1316.

In making the 1992 allocation, the Board hoped to stabilize the commercial troll and sport fisheries. Some Board members, however, stressed that they did not want or intend to prohibit the majority of the public—those categorized as sport fishers as opposed to commercial troll fishers—to be denied access to the resource, particularly personal use sport fishers. Additionally, several members of the Board indicated their belief that the 17% allocation for sport fishing would likely have to be adjusted in the future because it may not be the right percentage needed to accommodate both the expectations of commercial troll fishers and the increasing demand in the sport fishery.

Various sport fishing associations, charterboat organizations, and associations of lodge owners brought suit challenging the 1992 allocation regulation. *See id.* In addition to ruling that the regulation did not violate the "common use"[3] and "no exclusive right of fishery"[4] clauses of the Alaska Constitution, the Supreme Court ruled that

> the Board did take a hard look at the salient problems affecting the southeast

Treaty [king] harvests and engaged in reasoned decisionmaking in reaching its allocation decision. There is no evidence that the Board's allocation was unreasonable or arbitrary.

*Id.* at 1318–19.

Neither the sport fishers, nor all commercial troll fishers, were satisfied with the 1992 allocation. Eight different proposals to amend or repeal the 1992 allocation were submitted to the Board for the 1993/1994 session. The proposals submitted by the sport fishery interests ranged from repealing the 17% allocation so that sport fishers were again able to take treaty salmon subject only to bag and size limits, to allocating 50% of the treaty salmon to the sport fishery. Mr. Rutter, as a commercial troll fisher, submitted a proposal to reduce the sport fishery allocation to a level consistent with the ten year average during the years 1980 to 1990.

A review of the partial transcript of the Board's discussion that led to the adoption of the 3% reallocation regulation[5] indicates that many of the Board members believed that the 17% allocation to the sport fishery needed to be adjusted, as they had predicted, because it had proven to be too restrictive on the public's access to the resource.[6] For example, Board member Edfelt noted that some of the goals of the 1992 regulation were to allow uninterrupted sport fishing, to minimize regulatory restrictions on sport fishers not fishing from charter vessels, and to im-

---

3. Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.
   Alaska Const. art. VIII, § 3.

4. No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State. This section does not restrict the power of the State to limit entry into any fishery for purposes of resource conservation, to prevent economic distress among fishermen and those dependent upon them for a livelihood and to promote the efficient development of aquaculture in the State.
   Alaska Const. art. VIII, § 15.

5. The Supreme Court has stressed that it is important for the Board to make an adequate record so that its regulations can be subject to judicial review. *See Alaska Fish Spotters Ass'n v. State, Dep't of Fish & Game,* 838 P.2d 798, 801 (Alaska 1992). While the Court has recommended that the Board prepare a decisional doc-

ument, it has not imposed such an obligation on the Board. *See Tongass Sport Fishing Ass'n,* 866 P.2d at 1319. A transcript of the meeting at which a particular regulation is discussed and adopted is sufficient. *See id.* Further, even in cases that involve a decisional document, judicial review is not limited to that document; a court may consider other evidence of the Board's decision making process, including a transcript of the Board's meeting. *See Stepovak–Shumagin,* 886 P.2d at 644–47.

6. The vote to adopt the 3% reallocation regulation was four in favor, two against, and one absent. The two board members who voted against adopting the regulation did so primarily because they believed reallocation thwarted the goal of stability of the fisheries, which was the main reason for the Board adopting the 1992 allocation scheme.

pose the fewest restrictions on residents harvesting for personal use. He concluded that these goals had not been achieved by the 17% allocation because immediately after the regulation went into effect in 1992, the opportunity for residents to harvest king salmon was restricted, and was more severely restricted in 1993 when, in addition to bag limitations, the use of downriggers was temporarily prohibited.[7] He also noted that although the commercial troll fishers had stability in that they knew what quantity of fish they could harvest, the sport fishers—the largest group of users—did not have stability because of the impossibility of forecasting when the in-season restrictions would be put into place.[8]

Ultimately, the Board decided that to allow uninterrupted sport fishing with limited restrictions, at least until the next Board cycle, a 3% increase in the sport fishery allocation was needed. As required by AS 16.05.251(e) and 5 AAC 75.017, the Board considered the statutory allocation criteria in deciding to reallocate the 3%.[9] Board member Carlisle specifically listed each criteria, discussed how he applied the information presented to the Board to those criteria, and concluded that the criteria favored an increased sport fishing allocation because, under his analysis,

four of the factors favored the sport fishery, two were neutral, and one favored the commercial fishery. Board member Jacobson stated that he had gone through the allocation criteria along with Mr. Carlisle, but noted that he did not agree with all of Mr. Carlisle's conclusions. In contrast to Mr. Carlisle, he believed that commercial fishers do not always have other fishery resources available because of the restrictions placed on a person's ability to participate in the various commercial fisheries. The Chairperson agreed with most of Mr. Carlisle's conclusions, but noted that his two main concerns were the importance of each fishery to the economy of the state and the importance of each fishery to the economy of the region. He believed that both the commercial troll fishery and the sport fishery are of equal economic importance in different ways and in different areas.

Board member Edfelt adopted Mr. Carlisle's analysis of the allocation criteria. He also stated that his view of the criteria was the same as it was for the Board's deliberations for the 1992 decision to allocate 83% of the king treaty salmon to the commercial troll fishery and 17% to the sport fishery.[10]

Because the Supreme Court has already held that the initial 1992 allocative decision by the Board was valid, there is firm legal

---

7.  In both 1992 and 1993, ADF & G imposed regulatory restrictions to limit sport harvests as specified in the [king] management plan. These restrictions included a one [king] salmon bag limit, a ban on take by charter operators and crew, and, in 1993, a ban on the use of downriggers.

    Paul Suchanek, Alaska Dep't of Fish & Game, *Overview of the Sport Fishery for Chinook Salmon in Southeast Alaska*, 1994 Report to the Alaska Bd. of Fisheries 1.

8.  Board member Carlisle also noted that the goals of uninterrupted access and limited restrictions for recreational fishers had not been achieved as evidenced by the fact that restrictions had been imposed on sport fishers but not on commercial fishers. He indicated, however, that failure to satisfy these goals was not alone sufficient to indicate that an adjustment to the allocation was necessary. Instead, he analyzed the historical catches of the fisheries, considered the improved efficiency and methodology of taking fish, and noted that he believed the major problem was commercial prices which the Board could not control, rather than the increased

charter industry. Ultimately, he concluded that, all things considered, reallocation was appropriate.

9.  In his complaint, Mr. Rutter alleges that "[t]he Board failed to consider all relevant criteria." In making his argument in his cross motion for summary judgment, however, Mr. Rutter does not argue that the Board failed to consider the statutory criteria. Rather, he argues that the Board failed to consider certain information relevant to those criteria and that it failed to consider certain nonstatutory factors. While this may be true, the Board is not obligated to consider every possible factor. *See Gilbert v. State, Dep't of Fish & Game*, 803 P.2d 391, 398 (Alaska 1990) ("The fact that every possible factor may not have been debated does not vitiate the reasonableness of the regulation as a whole.").

10.  This fact is particularly important because, as already noted, the Supreme Court has ruled that "[t]here is no evidence that the Board's [1992] allocation was unreasonable or arbitrary." *Tongass Sport Fishing Ass'n*, 866 P.2d at 1319.

standing for this second decision to adjust the percentages between the fisheries. This fact and the fact that the Board's deliberations on the reallocation issue included analysis of the statutory factors, provides ample support for the conclusion that the 3% reallocation regulation is reasonable and not arbitrary. The regulation is valid.

. . . .

## IV. EQUAL PROTECTION UNDER THE UNITED STATES AND ALASKA CONSTITUTIONS

Amendment XIV, section 1 of the United States Constitution [11] and Article I, section 1 of the Alaska Constitution [12] guarantee people equal protection under the law. These clauses, however, require "equal treatment only for those who are similarly situated." *Shepherd v. State, Dep't of Fish & Game,* 897 P.2d 33, 43, 44 (Alaska 1995); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."). Commercial fishers and sport fishers are not similarly situated. *See Tongass Sport Fishing Ass'n,* 866 P.2d at 1318.

Thus, treating Mr. Rutter, as a commercial fisherman, differently than sport fishers does not implicate equal protection concerns. The regulations impose the same gear limitations and allocation percentages on all commercial troll fishers. Further, there is nothing in either the 3% reallocation regulation or in the downrigger regulation, nor in any other statute or regulation, that prohibits Mr. Rutter from engaging in the sport fisheries. If Mr. Rutter chose to engage in the sport fisheries, the regulations would apply equally to him.

## V. THE LIMITED ENTRY ACT (AS 16.43.140) and ARTICLE VIII, SECTION 16 OF THE ALASKA CONSTITUTION

### A. The Limited Entry Act (AS 16.43.140)

Mr. Rutter's argument with regard to the Limited Entry Act is not clear. He demands the equal protection of AS 16.43.140, but does not indicate how this statute provides him with equal protection guarantees. It appears that Mr. Rutter's argument is that he is denied equal protection of the laws because charter vessel operators are not required to obtain an entry permit under AS 16.43.140 while he is required to have a permit to participate in the commercial troll fishery.

Alaska Statute 16.43.140 provides, in relevant part:

> [A] person may not operate gear in the *commercial taking* of fishery resources without a valid entry permit or a valid interim-use permit. . . .

AS 16.43.140(a) (emphasis added). Thus, the plain language of AS 16.43.140 requires a person to obtain a limited entry permit only if that person is involved in the "commercial taking" of fishery resources. Mr. Rutter argues that the fact that sport fishers on charter vessels are allowed to use downriggers, the same type of gear used by commercial fishers, means the charter industry is engaged in the commercial use of the king salmon resource and therefore should be subject to the entry restrictions of AS 16.43.140.

The legislature has drawn a distinction between commercial users, sport users, and guided sport users of the fishery resources. *See* AS 16.05.251(a)(6) (granting the Board the authority to adopt regulations "classifying as commercial fish, sport fish, guided sport fish, personal use fish, subsistence fish, or predators or other categories essential for regulatory purposes"); AS 16.05.251(a)(12) (granting the Board the authority to adopt regulations "regulating commercial, sport, guided sport, subsistence, and personal use fishing as needed for the conservation, devel-

---

11. "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

12. "[A]ll persons are equal and entitled to equal rights, opportunities, and protection under the law." Alaska Const. art. I, § 1.

opment, and utilization of fisheries"). The legislature has also drawn a clear distinction between the commercial taking of fish and the sport taking of fish. Alaska Statute 16.05.940(5) defines commercial fishing as "the taking ... of fish ... with the intent of disposing of them for profit, or by sale, barter, trade, or in commercial channels." Alaska Statute 16.05.940(29) defines sport fishing as the "taking of or attempting to take for personal use, and not for sale or barter, any ... fish by hook and line held in the hand, or by hook and line with the line attached to a pole or rod which is held in the hand or closely attended, or by other means defined by the Board of Fisheries." [13]

While charter vessel operators may be engaged in a commercial activity—that of guiding sport fishers—they are not involved in the "commercial taking" of fishery resources because they are not taking fish with the intent of disposing of them for profit. Instead, it is the customers of the charter vessel operators who are taking the fish and are doing so as sport fishers—taking fish for personal use, and not for sale or barter. As the law now stands, charter vessel operators acting as guides for sport fishers are involved in the sport taking of fish, not in the commercial taking of fish. Therefore, the provisions of AS 16.43.140 in specific, and the Limited Entry Act in general, are not implicated. [14]

### B. Article VIII, Section 16 of the Alaska Constitution

Mr. Rutter argues that the 3% reallocation regulation violates Article VIII, section 16 of the Alaska Constitution, which provides:

**13.** The fact that the legislature specifically provided that the Board could define other means of engaging in sport fishing refutes Mr. Rutter's argument that use of downriggers somehow brings sport fishing under the auspices of the Limited Entry Act. As noted above, the key inquiry for the Limited Entry act is whether a person is involved in the "commercial taking" of fish, not what gear is being used in the taking.

**14.** To the extent that Mr. Rutter's argument deals with the differential requirements for sport fishers and commercial fishers, it has already been addressed above. Differential treatment of sport fishers and commercial fishers does not raise

No person shall be involuntarily divested of his right to the use of waters, his interests in lands, or improvements affecting either, except for a superior beneficial use or public purpose and then only with just compensation and by operation of law.

Mr. Rutter argues that by taking away 3% of the commercial troll fishery harvest of king salmon, he and other commercial troll fishers are being divested of their right to use the waters without compensation.

The Supreme Court has clarified that the phrase "use of water" in Article VIII, section 16 is coterminous with riparian rights. *Classen v. State, Dep't of Highways*, 621 P.2d 15, 17 n. 4 (Alaska 1980). "Riparian rights" are defined as

[t]he rights of the owners of land on the banks of watercourses, relating to the water, its use, ownership of soil under the stream, accretions, etc.

*Black's Law Dictionary* 1327 (6th ed.1990). Mr. Rutter's claim here is not based on his ownership of land adjacent to a watercourse. That is, Mr. Rutter's claim is not for divestment of his riparian rights. Therefore, the 3% reallocation regulation simply does not implicate Article VIII, section 16. [15]

### VI. PACIFIC SALMON TREATY

Mr. Rutter argues that the 3% reallocation regulation violates Annex IV, chapter 7 of the Pacific Salmon Treaty. This section of the treaty provides:

[w]ith respect to intercepting fisheries *not dealt with elsewhere in this Annex*, unless otherwise agreed, neither Party shall initiate new intercepting fisheries, nor conduct or redirect fisheries in a manner that intentionally increases interceptions.

equal protection concerns because the groups are not similarly situated.

**15.** Even assuming the court should consider Mr. Rutter's argument that the regulation is a divestment of his water rights, his argument fails. Mr. Rutter has not been divested of his right to use the water; he may still use the water for the purpose of commercial fishing. *See Classen v. State, Dep't of Highways*, 621 P.2d 15, 17 (Alaska 1980) (holding that a person has not been divested of his riparian rights if he is still able to use the water for the purpose he intended).

Pacific Salmon Treaty, annex IV, ch. 7 (emphasis added). The intercepting of king salmon in Southeast Alaska is dealt with elsewhere in the Annex:

> [I]n 1991, the all-gear catch in Southeast Alaska shall not exceed the base ceiling of 263,000 [king] salmon plus 10,000; in 1992, the all-gear catch in Southeast Alaska shall not exceed 263,000 [king] salmon; these catches exclude the Alaska hatchery add-on as described in the letter of transmittal; in 1991 and 1992 Alaska shall open its general summer troll fishery on July 1; the June fishery shall not exceed 40,000 [king] salmon (excluding the Alaska hatchery add-on) taken in a manner similar to 1989 and 1990; and areas of high [king] abundance shall be closed during [king] non-retention periods to reduce incidental mortalities.[16]

Pacific Salmon Treaty, annex IV, ch. 3(1)(e).

Because the Southeast Alaska king intercepting fishery is dealt with elsewhere in the treaty annex, the general provisions of chapter 7 do not apply. Therefore, Mr. Rutter's argument that the 3% allocation regulation violates this chapter must fail.

Further, if properly enforced, the 3% reallocation regulation would not violate the relevant provisions of chapter 3. The regulation reallocates a fixed number of salmon between the commercial troll fishery and the sport fishery of Southeast. While this regulation has increased the number of salmon the sport fishery may take, it has decreased proportionately the number of salmon the commercial troll fishery may take. Therefore, the total number of fish taken should not exceed the treaty limits.

## VII. *CONCLUSION*

For all the above reasons, the court grants summary judgment in favor of the State on all of Mr. Rutter's claims.

---

16. The treaty uses "chinook" instead of "king."