**STATE of ALASKA, ALASKA BOARD OF FISHERIES, and Alaska Department of Fish and Game, Appellants/Cross–Appellees,**

v.

**Michael GRUNERT, Jim Rockom, Mori Jones, Paul Johnson, Andy Shangin, Harvey Kalmakoff, Clement Shangin, Marvin Yagi, Bernard Skonberg, John Jones, Frank Grunert, Clemens Grunert, Andy Stepanoff, Clifford Brandal, Alec Brandal, and Al Anderson, Appellees/Cross–Appellants.**

Nos. S–11951, S–11991.

Supreme Court of Alaska.

April 21, 2006.

Rehearing Denied Aug. 22, 2006.

Lance B. Nelson, Senior Assistant Attorney General, Anchorage, and David W. Márquez, Attorney General, Juneau, for Appellants/Cross–Appellees.

Arthur S. Robinson, Robinson & Associates, Soldotna, for Appellees/Cross–Appellants.

Gregory F. Cook, Douglas, for Amici Curiae Chignik Seiners Association and Chignik Seafood Producers Alliance.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

We consider here the validity of a 2005 emergency regulation creating a cooperative Chignik purse seine salmon fishery. In *Grunert v. State (Grunert I)*, we invalidated former 5 Alaska Administrative Code (AAC) 15.359 (2002), an Alaska Board of Fisheries regulation that created a cooperative fishery within the Chignik purse seine salmon fishery. In response to *Grunert I*, the board in 2005 adopted an emergency regulation that

retained the basic cooperative scheme but that required each permit holder in the cooperative to "actively participate" in the fishery by making at least ten deliveries during the fishing season. When Michael Grunert and other commercial fishers brought suit, the superior court held the emergency regulation invalid per *Grunert I.* The board appealed. After hearing oral argument on February 3, 2006, we issued a dispositive order on February 9. Our opinion today explains our reasoning more thoroughly. We hold that the board exceeded its authority by promulgating the 2005 emergency regulation, former 5 AAC 15.358, because the cooperative fishery created by the emergency regulation was fundamentally at odds with the Limited Entry Act, AS 16.43. We also hold that the emergency regulation employed means outside the board's authorized powers to allocate fishery resources within a single fishery. Although the emergency regulation has now expired, we consider these and other issues raised by the cooperative scheme under the public interest exception to the mootness doctrine.

## II. FACTS AND PROCEEDINGS

Many of the facts underlying this case were set out in our opinion in *Grunert v. State (Grunert I).*[1] In 2002, in response to declining salmon prices in the Chignik commercial salmon fishery, the Board of Fisheries (board) promulgated regulations authorizing a majority of Chignik salmon purse seine permit holders to apply to fish as a cooperative.[2] After more than the minimum number of permit holders applied to participate, the board issued a single cooperative fishery permit to the cooperative (Chignik Seafood Producers Alliance) and allocated to the cooperative a percentage of the "harvestable surplus" of Chignik sockeye salmon based on the number of permit holders participating in the cooperative.[3] The cooperative fishery had goals of decreasing overhead expenses and improving fish quality by controlled harvesting.[4] Both goals would be advanced by reducing the number of fishing vessels in the fishery.[5]

Michael Grunert, a high-earning Chignik salmon purse seine fisher and permit holder, did not participate in the 2002 cooperative and instead filed a complaint in superior court in April 2002 challenging the validity of the cooperative regulation.[6] One other Chignik salmon purse seine permit holder joined Grunert in the litigation.[7]

While the Grunert lawsuit was pending, the board made minor changes to the cooperative regulation, 5 AAC 15.359, in 2003[8] and changed the allocation formula in 2004.[9] The board also amended the regulation to allow cooperative fishers to use equipment different from that open fishers were permitted to use under 5 AAC 15.330, 15.332, 39.240, and 39.260.[10]

1. *Grunert v. State (Grunert I),* 109 P.3d 924, 926–28 (Alaska 2005).

2. *Id.* at 927; *see also* former 5 AAC 15.359 (2002). The board regulations distinguished between the "cooperative fishery" and the "open fishery." "Cooperative fishery" was defined as "a commercial purse seine salmon fishery in which, by agreement of the participants, the number of fishing vessels may be reduced with the intent of decreasing overhead expenses associated with commercial fishing and controlling the rate of harvest to achieve a higher quality product." Former 5 AAC 15.358(j)(1) (emergency regulation expiring 9/2/05); *see also* former 5 AAC 15.359(g)(1) (2002). "Open fishery" was defined as "a commercial purse seine fishery conducted by CFEC permit holders who did not participate in the cooperative fishery." Former 5 AAC 15.358(j)(2); *see also* former 5 AAC 15.359(g)(2).

3. *See* former 5 AAC 15.359(c) & (d) (2002); *Grunert I,* 109 P.3d at 927.

4. Former 5 AAC 15.359(g)(1) (2002).

5. *See id.*

6. *Grunert I,* 109 P.3d at 928.

7. *Id.*

8. *See* former 5 AAC 15.359 (2003).

9. *See* former 5 AAC 15.359(d) (2004).

10. *Compare* former 5 AAC 15.359(c) (2005) (allowing cooperative permit to contain gear specifications other than those specified in 5 AAC 15.332), (f)-(g) (notwithstanding 5 AAC 39.240 and .260, allowing cooperative fishers to use two fixed leads), (h) (allowing cooperative fishers to use net pens) *with* 5 AAC 15.330(a) (mandating that salmon in Chignik area only be taken by purse seine and hand purse seine), 15.332(c) (prohibiting use of seines more than 125 fathoms

The superior court rejected Grunert's challenge and held that the cooperative regulation was statutorily and constitutionally valid.[11] Grunert appealed and on March 17, 2005 we reversed the superior court judgment and held that the regulation was fundamentally at odds with the Limited Entry Act.[12] The intervenor, Chignik Seiners Association, petitioned for rehearing and moved for a stay of our decision until after the 2005 salmon fishing season. We denied both the petition and the motion on April 22, 2005.

In response to our decision in *Grunert I*, the Chignik Seafood Producers Alliance (the Alliance) petitioned the board to adopt an amended version of the cooperative regulation as an emergency regulation. The board met on May 2 and May 4, 2005 in response to the Alliance's petition and voted to take no action on the petition. Instead, the board considered whether to find an emergency under AS 44.62.250, which gives agencies authority to promulgate an emergency regulation upon making a written finding that the regulation "is necessary for the immediate preservation of the public peace, health, safety, or general welfare." After considering the comments of board members about the detrimental effects potentially resulting from the unavailability of a cooperative for the 2005 Chignik salmon season, the board voted to find an emergency under AS 44.62.250. The board then considered and adopted Emergency Regulation 5 AAC 13.358, an amended version of the invalidated cooperative regulation. The board did not intend to make the regulation permanent, and it expired on September 2, 2005.

The emergency regulation differed from the original cooperative regulation in a number of ways. The emergency regulation required cooperative participants to "actively participate" in the fishery as a prerequisite to any remuneration:

in length in Chignik Bay District), 15.332(e) (allowing purse seines in Chignik area to be operated in conjunction with leads), 39.240 (describing general gear specifications), 39.260 (prescribing how leads and seines may be operated together).

**11.** *Grunert I,* 109 P.3d at 928.

**12.** *Id.* at 926.

[A] CFEC permit holder who participates in the annual cooperative fishery . . . (C) must actively participate in the cooperative fishery to receive any economic benefit; for the purposes of this subparagraph, "actively participate" means to make at least 10 deliveries of salmon to a buyer using the participant's CFEC permit card; it does not mean a CFEC permit holder has to participate in the cooperative fishery from season opening to season closing, and it does not mean that every boat registered for the Chignik salmon fishery be used in the cooperative fishery.[13]

The emergency regulation prohibited multiple permit holders from splitting deliveries: "All fish from each delivery must be attributed to only one CFEC permit holder on an [Alaska Department of Fish and Game] fish ticket; no split deliveries may be made."[14] The emergency regulation also incorporated those 2005 amendments to the former regulation that permitted different types of equipment to be used in the cooperative fishery:

(f) The participants in the cooperative fishery may operate a fixed lead only under the conditions of a commissioner's permit. Notwithstanding 5 AAC 39.260, a vessel attached to a fixed lead or to a seine attached to a fixed lead may be allowed to go dry or be anchored without the vessel engine running in the waters of the Chignik Bay District from Mensis Point to Pillar Rock, as long as the lead and seine are not configured to form a fish trap prohibited under AS 16.10.070 and 16.10.100.

(g) Notwithstanding 5 AAC 39.240, and only under the conditions of a commissioner's permit, a vessel may have on board a purse seine or hand purse seine and up to two fixed leads.

(h) The participants in the cooperative fishery may use net pens to hold live salmon until processing, only under the conditions specified in a commissioner's permit.[15]

**13.** Former 5 AAC 13.358(b)(7).

**14.** Former 5 AAC 13.358(i).

**15.** Former 5 AAC 13.358(f)-(h); *see* former 5 AAC 13.359(f)-(h) (2005).

On May 16, 2005 Grunert and other Chignik commercial fishers and fish tenders (collectively, Grunert) challenged the validity of the emergency regulation by filing a superior court complaint against the State of Alaska, Alaska Board of Fisheries, and Alaska Department of Fish and Game (collectively, the board) for declaratory and injunctive relief. Grunert alleged that the board did not have authority to adopt the emergency regulation without legislative approval of cooperative salmon fisheries and that no emergency existed to justify the board adopting the emergency regulation. Grunert simultaneously moved for summary judgment and requested a speedy hearing and advancement on the court's calendar. The board timely opposed and cross-moved for summary judgment.

Superior Court Judge William F. Morse heard oral argument on the cross-motions for summary judgment on June 1, 2005 and promptly announced the superior court's decision the next day.[16] First, the court concluded that the timing of the publication of our *Grunert I* decision created an emergency and that the board met the procedural requirements for promulgating a regulation in response to that emergency. It found that the "general welfare" of the fishery was at stake because permit holders who had previously fished in the cooperative fishery and who wanted to fish during the 2005 season did not have enough time to deal with all of the "financial, logistical, personnel, personal, and equipment arrangements" necessary to participate in the fishery. Second, it found that the cooperative and open fisheries are two distinct fisheries. Third, it found that the emergency regulation was invalid because it exceeded the statutory authority of the board. The court noted that *Grunert I* made clear that the Limited Entry Act restricts eligibility for permits to natural persons who are economically dependent on and actively participating in fishing. The court found that the cooperative regime under the

emergency regulation was still "dramatically different" from the regime envisioned by the Limited Entry Act. The court noted that the cooperative system changes the distribution of profit, reduces competition, permits different timing and pace of participation, allows some cooperative members to maintain alternative primary occupations, changes the amount of risk involved in commercial fishing, changes the economic model of commercial fishing, and encourages less equipment and a smaller support system. The court concluded that the emergency regulation did not satisfy the problems identified in *Grunert I* and that the regulation was therefore invalid.

The superior court entered final judgment for the Grunert plaintiffs. The board immediately filed an emergency motion for stay of the judgment. We granted the stay through the end of the 2005 Chignik salmon season and stated that we would consider any appeal of the final judgment on an expedited basis.

The board appealed that part of the superior court's decision that declared the emergency regulation inconsistent with the Limited Entry Act and *Grunert I*. Grunert cross-appealed the superior court's approval of the board's finding of an emergency and the superior court's conclusion that the cooperative fishery and the open fishery are two different fisheries.

On November 16, 2005, after the opening briefs had already been filed in this appeal, the board voted to adopt a permanent regulation for a Chignik cooperative fishery similar to that permitted by the 2005 emergency regulation.[17] Among other things, this conditionally approved regulation will retain the ten-delivery requirement, but will restrict the total number of deliveries a cooperative participant may make in a season to thirty-five.[18]

We heard oral argument on February 3, 2006 and issued a dispositive order on Febru-

---

**16.** We attach the superior court's thoughtful and insightful opinion as Appendix A.

**17.** The board explains on appeal that "[t]he stated intent of the Board on the record was that it intends the new regulation to be implemented only if this appeal upholds the validity of the substance of the 2005 emergency regulation."

**18.** The existence of the conditionally approved permanent regulation is relevant to the mootness issue discussed in Part III.B, but we do not consider the validity of the conditionally approved regulation here. We consider only the adequacy of the emergency regulation.

ary 9.[19]

## III. DISCUSSION

### A. Standard of Review

■ We review a superior court's grant of summary judgment de novo.[20]

■ We review emergency regulations in the same way we review other agency regulations.[21] We presume that a regulation promulgated under the Alaska Administrative Procedures Act (APA) is both procedurally and substantively valid and place the burden of proving otherwise on the challenging party.[22] Grunert argues that the board bears the burden of proving the regulation's validity because the regulation was promulgated as an emergency regulation, bypassing the notice and comment procedures of the APA. We disagree. Emergency regulations promulgated in accordance with AS 44.62.250 enjoy the same presumption of validity as regulations promulgated after a notice and comment process.[23] We presume that the emergency regulation was valid, and that Grunert bears the burden of demonstrating that it was not.

■ We will uphold a regulation so long as it is consistent with and reasonably necessary to implement the statutes authorizing its adoption. As we explained in *Grunert I,*

our review of agency regulations involves the following analyses:

> [W]e consider first whether the board exceeded its statutory mandate in promulgating the regulation, either by pursuing impermissible objectives or by employing means outside its powers. Determining the extent of an agency's authority involves the interpretation of statutory language, a function uniquely within the competence of the courts and a question to which we apply our independent judgment. Second, we consider whether the regulation is reasonable and not arbitrary. Where highly specialized agency expertise is involved, we will not substitute our own judgment for the board's. Our role is to ensure only that the agency has taken a hard look at the salient problems and has genuinely engaged in reasoned decision making. And third, we consider whether the regulation conflicts with any other state statutes or constitutional provisions.[24]

### B. We Review the Validity of the Emergency Regulation Under the Public Interest Exception to the Mootness Doctrine.

■ Because the emergency regulation has expired and no relief can be granted to reverse its effect on the 2005 Chignik purse seine salmon season, the question of the regulation's validity is technically moot.[25] Al-

---

19. We attach our February 9, 2006 order as Appendix B.

20. *Sengupta v. Wickwire,* 124 P.3d 748, 752 (Alaska 2005).

21. *See N. Slope Borough v. Sohio Petroleum Corp.,* 585 P.2d 534, 543–44 (Alaska 1978) (reviewing emergency regulation to ensure that regulation is consistent with and reasonably necessary to carry out purposes of authorizing statute and to ascertain whether regulation is reasonable and not arbitrary).

22. *Union Oil Co. of Cal. v. State, Dep't of Natural Res.,* 574 P.2d 1266, 1271 (Alaska 1978); *see also Koyukuk River Basin Moose Co–Mgmt. Team v. Bd. of Game,* 76 P.3d 383, 389–90 (Alaska 2003) (holding that challengers had not met their burden of showing that Board of Game's decision not to manage moose as a distinct game population was unreasonable); *Gilbert v. State, Dep't of Fish & Game, Bd. of Fisheries,* 803 P.2d 391, 394 (Alaska 1990) (noting that Board of Fisheries regulation is "considered procedurally presump-

tively valid once a certified copy has been filed" and that challenger must show a substantial failure to comply with the APA in order to rebut the presumption of procedural validity).

23. Per AS 44.62.250, pre-adoption notice and public comment procedures do not apply when an agency promulgates an emergency regulation. Grunert has not alleged that the board did not follow the procedures required by AS 44.62.250 for promulgating an emergency regulation.

24. *Grunert I,* 109 P.3d at 929 (internal quotation marks and citations omitted).

25. *See Akpik v. State, Office of Mgmt. & Budget,* 115 P.3d 532, 535 (Alaska 2005) (explaining that a claim is moot "if it has lost its character as a present, live controversy") (quoting *Kodiak Seafood Processors Ass'n v. State,* 900 P.2d 1191, 1195 (Alaska 1995)); *O'Callaghan v. State,* 920 P.2d 1387, 1388 (Alaska 1996) (explaining that a case is moot "if the party bringing the action

though we generally refrain from deciding questions when events have rendered the legal issues moot, we may consider certain issues if they fall within the public interest exception to the mootness doctrine.[26]

▮▮ We consider three factors in determining whether an issue falls within the public interest exception: "(1) whether the disputed issues are capable of repetition, (2) whether the mootness doctrine, if applied, may cause review of the issues to be repeatedly circumvented, and (3) whether the issues presented are so important to the public interest as to justify overriding the mootness doctrine."[27] "None of these factors is dispositive; · each is an aspect of the question of whether the public interest dictates that a court review a moot issue."[28]

▮▮ All three factors support present review. First, the disputed issues are capable of repetition and indeed have already repeated themselves. On November 16, 2005 the board voted to adopt a permanent regulation similar to the 2005 emergency regulation. In addition, the board informed us at oral argument that it has established cooperative regimes in other fisheries around the state. Second, because the publication of a judicial decision regarding a permanent regulation might unavoidably occur shortly before a new Chignik purse seine salmon season, the board might again feel compelled to promulgate another short-term emergency regulation, potentially preventing effective judicial review. Moreover, because the board has already voted to adopt a substantially similar permanent regulation, failing to review the now-expired emergency regulation will merely delay judicial review of the essence of the cooperative scheme. Dismiss-

ing the appeal as moot will not advance issue finality or judicial or party economy. Third, the board argues that the validity of the cooperative regime is of great public interest. We agree. That great public interest is evidenced by the numerous meetings of the board to consider regulatory changes to the Chignik fishery as well as. by the outcry of members of the public both opposing and supporting the state's motion to stay *Grunert I.* Because the emergency regulation was similar to the recently proposed regulation, because the board has dedicated a substantial amount of time to the cooperative program, and because many people have an interest in the outcome, we will consider whether the emergency regulation was valid under the public interest exception.

▮▮ But we decline to consider the reasonableness of the board's finding of an emergency.[29] A finding of emergency follows a fact-intensive inquiry into a set of events unlikely to be repeated, and the prospect of a permanent regulation reduces the likelihood of another emergency regulation for a Chignik cooperative fishery. The public interest exception does not justify review of this moot issue.

**C.  The Chignik Cooperative Fishery Scheme Permitted by Former 5 AAC 15.358 Was Fundamentally at Odds with the Limited Entry Act.**

In *Grunert I,* we stuck down former 5 AAC 15.359 (2002) because it was "fundamentally at odds with the Limited Entry Act."[30] We explained that a central premise of the limited entry system is that permit holders are individuals who actively fish.[31]

---

would not be entitled to any relief even if [it] prevail[s]'') (quoting *Maynard v. State Farm Mut. Auto. Ins. Co.,* 902 P.2d 1328, 1329 n. 2 (Alaska 1995)).

26.  *Akpik,* 115 P.3d at 535.

27.  *Id.* (quoting *Kodiak Seafood Processors,* 900 P.2d at 1195).

28.  *Kodiak Seafood Processors,* 900 P.2d at 1196.

29.  Our decision not to reach the question whether an emergency existed will not foreclose proce-

dural or substantive challenges to the new permanent regulation if it takes effect.

30.  *Grunert I,* 109 P.3d at 926.

31.  *See id.* at 934; *see also id.* at 933 ("[F]eatures of the limited entry system reflect an intention that permit holders be, at minimum, individuals who were actively fishing."); *id.* at 934 (noting that factors used by Commercial Fisheries Entry Commission (CFEC) to issue initial limited entry permits "protect those who actually take fish"); *id.* at 934 (noting that subsequent limited entry permits are issued to those presently able to

We also explained that the Limited Entry Act was enacted to protect "economically dependent fisher[s]."[32] Our main concern with the cooperative regime created under former 5 AAC 15.359 was that it did not require "active participation" of all Chignik salmon purse seine permit holders.[33] The Chignik cooperative fishery scheme was incompatible with the limited entry system "because it allow[ed] people who [were] not actually fishing to benefit from the fishery resource."[34]

Although the lack of an active participation requirement was the flaw on which we focused the most attention in *Grunert I*, we expressed concern with other aspects of the cooperative regime as well. For example, we expressed concern with the reduced number of crew members necessary under the cooperative regime.[35] We noted that the cooperative regulation may interfere with the ability of the Commercial Fisheries Entry Commission (CFEC) to determine the optimum number of permits because the regulation "destroys any relation between the number of permits issued per fishery and the ultimate number of participating vessels and units of gear."[36] And we criticized the corporate-like nature of the cooperative regime: "the cooperative regulation . . . transforms the limited entry permit from what used to be a personal gear license into a mere ownership share in a cooperative organization."[37]

We directed the board to seek legislative approval: "Before this regulatory scheme accomplishes such radical departure from the historical model of limited entry fisheries in Alaska and the spirit of the Limited Entry Act, . . . we conclude that the legislature must first authorize the board to approve cooperative salmon fisheries."[38] We repeat that command here.

The emergency regulation was not a valid exercise of the board's authority. Although the ten-delivery requirement mandated some significant participation by each participating permit holder, the emergency regulation still allowed permit holders in the cooperative to benefit economically from the work of others. As long as the cooperative fishers made ten deliveries, they received the same profit as cooperative fishers who made more than ten deliveries. It is this aspect of the Chignik cooperative scheme that is so contradictory to the Limited Entry Act.

The emergency regulation also did not resolve the problem of interference with the CFEC's ability to determine the optimum number of permits per fishery.[39] The CFEC determines the optimum number of permits, in part, based on time spent fishing and investment in vessels and gear.[40] But the emergency regulation, like the predecessor regulation, did not require each fisher to operate his or her own gear and vessel and it minimized the amount of time many of the cooperative fishers needed to spend fishing.[41]

engage actively in fishery); *id.* at 934 (noting that CFEC establishes optimum number of permits by considering economic dependence of individuals on fishery and time and money those individuals have invested in "actually fishing"); *id.* at 935 ("Participation by the individual is inherent in the limited entry permit system.").

32. *Id.* at 935.

33. *Id.*

34. *Id.* (also stating that Limited Entry Act was not intended to protect individuals who "indirectly 'fish' while holding down an office job or sitting at home").

35. *Id.*

36. *Id.* at 935 n. 61.

37. *Id.* at 936.

38. *Id.* at 936. The cooperative regulation under review in *Grunert I* was also challenged as being violative of the Alaska Constitution's common use and equal access clauses, article VIII, sections 3 and 17, respectively. It was unnecessary in *Grunert I* to consider those claims, nor is it necessary here. But we note that to the extent a program has the practical effect of transferring to a single entity the exclusive exploitative rights to a substantial portion of a fishery, it may present questions of validity under these sections. *See Grunert I,* 109 P.3d at 932–33.

39. *Id.* at 935 n. 61.

40. AS 16.43.290.

41. For example, although seventy-seven Chignik purse seine permit holders participated in the cooperative fishery in 2002, only eighteen boats were used. *Grunert I,* 109 P.3d at 928.

The board urges us to read *Grunert I* narrowly, and suggests that *Grunert I* only identified one fatal flaw—the lack of meaningful, active participation by all fishers—in an otherwise valid regulatory regime. The board argues that in *Grunert I* we held that the board does not have authority to promulgate a cooperative fishery regulation that does not require active participation. It argues that by requiring significant participation in the cooperative fishery it has satisfied our holding. Likewise, the dissenting opinion attached to our February 9, 2006 order suggested that *Grunert I* never signaled complete rejection of a cooperative fishery and impliedly condoned a cooperative fishery in which permit holders had significant active participation even if they did not make every delivery that directly benefitted them. Today's dissenting opinion repeats that argument here.[42] But nothing we said in *Grunert I* expressed a notion that cooperative participants could be active participants if they derived benefit from deliveries they did not make. And nothing in *Grunert I* implied as much, either.

It was not necessary in *Grunert I* to decide whether a partial participation scheme such as that allowed by the emergency regulation might satisfy the Limited Entry Act. The emergency regulation had not yet been adopted when we issued *Grunert I* and the state never contended in *Grunert I* that a partial participation scheme might satisfy the Limited Entry Act. There was therefore no reason for us to anticipate future promulgation of a partial participation scheme. But even if we had anticipated that possibility, it would not have been necessary to address its validity; the only question before us was the validity of the 2002 regulation then in litigation.

Although the ten-delivery requirement softened the distinction between the cooperative model and the "model of the economically dependent fisher whom the Limited Entry Act was intended to protect,"[43] the two models still fundamentally differ. The emergency regulation still allowed cooperative fishers to benefit economically from the work of other fishers.[44] The legislature might conclude that such a cooperative fishery is desirable and that the board should have authority to approve a Chignik cooperative commercial fishery.[45] But because it has not yet done so, the emergency regulation was not authorized by the Limited Entry Act.[46]

**D. The Chignik Cooperative Fishery Scheme Permitted by Former 5 AAC 15.358 Impermissibly Allocated Within a Single Fishery.**

The emergency regulation, former 5 AAC 15.358, allowed cooperative participants to use fixed leads and net pens, as well as longer seines, tools not available to the open fishers under the code provisions applicable to them, including 5 AAC 15.330, 15.332,

---

42. Dissent at 1241.

43. *See Grunert I*, 109 P.3d at 935.

44. The dissenting opinion suggests that we are "drastically chang[ing] the discussion" by identifying a new flaw in the cooperative scheme—the fact the emergency regulation allowed permit holders to benefit economically from the work of others. Dissent at 1241. But in *Grunert I* we stated that "the Chignik cooperative fishery scheme is fundamentally at odds with [the idea of active individual participation] *because it allows people who are not actually fishing to benefit from the fishery resource.*" 109 P.3d at 935 (emphasis added). The cooperative scheme addressed in *Grunert I* differed from the cooperative scheme we consider here, but our conclusion is the same: The legislature must give the board statutory authority to create a fishery scheme in which permit holders profit from the harvests of other permit holders.

45. We were informed at oral argument that our decision may affect other cooperative fisheries. We express no opinion about those fisheries. We have been given no specific information about those fisheries and at oral argument it appeared there were disputes about how each of those fisheries should be defined, such as whether any of them involves a single "fishery."

46. The dissenting opinion suggests that our holding here forbids "[a]ny board-authorized sharing of effort, pooling of resources, or cooperative venture." Dissent at 1241. But we here address only a board-promulgated regulation that gave to the cooperative fishers rights and benefits that differed from those available to fishers who did not choose to participate in the cooperative fishery; we express no opinion about voluntary cooperative efforts of individual fishers.

39.240, and 39.260.[47] The superior court determined that the board could reasonably conclude that the cooperative fishery and open fishery were different fisheries because they use different gear types. We disagree.

The Chignik commercial salmon fishery has been a *purse seine* fishery for over one hundred and twenty years.[48] Since implementation of the Limited Entry Act, commercial fishers in the Chignik salmon fishery have held Chignik CFEC salmon *purse seine* permits.[49] The part of the board's Chignik area regulation entitled "Gear" has been in effect since before 1988.[50] It states that "salmon may be taken only by purse seine or hand purse seine."[51] It is against this background that the board contends that the regulation created two fisheries in the Chignik area: a "purse seine" fishery in which the open fishers used the traditional gear—purse seines and leads—and a "purse seine plus" fishery in which the cooperative fishers used the traditional gear plus longer seines, fixed leads, and net pens. But these differences in gear and gear size, although potentially dramatically different in efficiency, did not fundamentally alter the fact that all holders of CFEC purse seine permits continued to harvest Chignik salmon with purse seine gear.

Alaska Statute 16.05.251(e) authorizes the board to allocate fishery resources "among personal use, sport, guided sport, and commercial fisheries." We explained in *Grunert I* that "among" means "between," not "within," the fisheries.[52] The board's authorizing statute defines "fishery" as "a specific administrative area in which a specific fishery resource is taken with a specific type of gear."[53] That statute also defines "gear" and "type of gear" as follows:

(A) "gear" means the specific apparatus used in the harvest of a fishery resource; and

(B) "type of gear" means an identifiable classification of gear and may include

(i) classifications for which separate regulations are adopted by the Board of Fisheries or for which separate gear licenses were required by former AS 16.05.550–16.05.630; and

(ii) distinct subclassifications of gear such as "power" troll gear and "hand" troll gear or sport gear and guided sport gear.[54]

47. *Compare* 5 AAC 15.330(a) (mandating that salmon in Chignik area only be taken by purse seine and hand purse seine), 15.332(c) (prohibiting the use of seines more than 125 fathoms in length in Chignik Bay District), 15.332(e) (allowing purse seines in Chignik area to be operated in conjunction with leads), 39.240 (describing general gear specifications), 39.260 (prescribing how leads and seines may be operated together) *with* former 5 AAC 15.358(c) (allowing cooperative permit to contain gear specifications other than those specified in 5 AAC 15.332), (f)-(g) (notwithstanding 5 AAC 39.240 and .260, allowing cooperative fishers to use two fixed leads), (h) (allowing cooperative fishers to use net pens). It appears from the record that in certain portions of the Chignik Bay District, cooperative fishers were allowed to use seines longer than those used by the open fishers. In the Chignik Bay District, open fishers may only use seines 100–125 fathoms long. 5 AAC 15.332(c). But the record indicates that the cooperative permit allowed cooperative fishers to use seines 225 fathoms long within certain portions of the Chignik Bay District.

48. *Grunert I*, 109 P.3d at 926.

49. *Id.*

50. 5 AAC 15.330.

51. *Id.*

52. *Grunert I*, 109 P.3d at 931. In *Grunert I*, we stated that if the cooperative fishery and the open fishery use the same type of gear, an allocation of resources to the cooperative would entail an impermissible allocation within a single fishery. *Id.* at 932. But we left open the question whether there was a substantive difference between cooperative and open fishery gear. *Id.* at 932, 931 n. 24.

53. AS 16.05.940(14). The Limited Entry Act's definition of "fishery" is functionally identical to that in AS 16.05. *See* AS 16.43.990(4) (defining "fishery" as "the commercial taking of a specific fishery resource in a specific administrative area with a specific type of gear"). In *Grunert I*, we referred to the Limited Entry Act's definition of "fishery" in discussing the single-fishery issue. *Grunert I*, 109 P.3d at 931–32. The correct reference should have been AS 16.05.940(14), the statute directly governing the board.

54. AS 16.05.940(14)(A)—(B). The Limited Entry Act defines "gear" as "the specific apparatus used in the commercial harvest of a species, including but not limited to purse seines, drift gill nets, set gill nets, and troll gear." AS 16.43.990(5). The Limited Entry Act defines "type of gear" as

The differences in equipment the board authorized for open and cooperative fishers did not create two distinct fisheries under AS 16.05.940(14). The words of both the board's authorizing statute and the Limited Entry Act make it clear that the legislature intended to distinguish between types of gear based on broad methodological differences.[55] The definitions of "gear" and "types of gear" distinguish between power troll and hand troll gear and refer to historical distinctions, for example, between set and long lines, drift, set and stake gill nets, and purse and hand purse seines, suggesting real-world, methodological, gross differences between equipment types.[56] But the alterations in equipment the board authorized for open and cooperative fishers did not change the fundamental method by which Chignik salmon are harvested. The Chignik salmon are harvested by purse seine, whether open or cooperative fishers harvest them. Cooperative fishers used fixed leads before the salmon were harvested and used net pens after harvesting the salmon. These additional tools were thus incidental to the type of gear—the purse seines—actually used to harvest the Chignik salmon.

The statutory definition of "type of gear" includes "classifications for which separate regulations are adopted by the Board of Fisheries."[57] But the board has not adopted separate regulations classifying net pens or fixed leads as distinct types of gear. The board regulation that lists "legal types of gear" does not even mention net pens or fixed leads.[58] And although we are not required to decide here whether the board could adopt a regulation classifying a net pen or a fixed lead as a "type of gear" within the meaning of the statute, we note that doing so would not necessarily resolve Grunert's contention the board cannot do so legally.

The statutory definition of "type of gear" also includes "classifications . . . for which separate gear licenses were required by former AS 16.05.550—16.05.630."[59] Former AS 16.05.550–.630 did not require separate gear licenses for fixed leads or net pens, nor did those provisions require separate gear licenses for purse seiners using fixed leads or net pens, nor, indeed, did they even mention fixed leads or net pens.[60] Historically there is no sign that the legislature, the board, or the CFEC distinguished between those fishers who were using net pens and fixed leads and those who were not.

Moreover, net pens are not "gear." A net pen is not a "specific apparatus used in the harvest" of salmon,[61] but is a device used to store live salmon after they are harvested and before they are transferred to processors. And the only apparent difference between leads and fixed leads is that fixed leads may be operated unattached to the purse seine and affixed to the bottom of the sea by anchors. Fixed leads and leads are therefore not "distinct subclassification[s] of gear" when they are used in conjunction with a recognized method, e.g., by purse seine, of harvesting the fish.[62]

a customary and identifiable classification of gear [that] include[s]:
(A) those classifications for which separate regulations were adopted by the Board of Fisheries and for which separate gear licenses were required by former AS 16.05.550–16.05.630; and
(B) distinct subclassifications of gear such as "power" troll gear and "hand" troll gear.
AS 16.43.990(10).

55. *See* AS 16.05.940(14)(A), (B); AS 16.43.990(5), (10).

56. *See* AS 16.05.940(14)(B) (referring to former AS 16.05.550–16.05.630); *see also* AS 16.43.990(10)(B) (referring to former AS 16.05.550–16.05.630), .990(5) (listing purse seines, drift gill nets, set gill nets, and troll gear as gear).

57. AS 16.05.940(14)(B)(i); *see also* AS 16.43.990(10).

58. 5 AAC 39.105(d). Although 5 AAC 39.105(d)(18) includes a "lead" as a legal type of gear, it does not distinguish between un-fixed and fixed leads.

59. AS 16.05.940(14)(B)(i); *see also* AS 16.43.990(10).

60. *See* former AS 16.05.550–.630 (1973). Before 1977, separate gear licenses were required for troll lines, set or long lines, drift gill nets, set or stake gill nets, beach or drag seines, purse and hand purse seines, beam and otter trawls, dredges for scallops, and shellfish pots. *Id.*

61. *See* AS 16.05.940(14)(A).

62. *See* AS 16.05.940(14)(B).

Finally, the board argues that the combination of fixed leads, longer seines, and net pens allows cooperative fishers to operate a materially different type of fishery. It asserts that the pace of a cooperative fishery is slower and that the fishery is directed by only a few experienced fishers. It argues that the legislature intended that methodological differences in the way actual mechanical gear is used to take fish would be considered in differentiating between fisheries. The board contends that AS 16.05.940(14)(B)(ii) "contemplates distinctions between fisheries such as those that exist between cooperative and competitive fisheries, just as it does for sport and guided sport fisheries."

We assume the cooperative fishers did or could fish at a slower pace than those operating in the open fishery. But we do not believe that this distinction made the cooperative fishery a separate fishery under AS 16.05.940(14). As discussed above, the legislature apparently intended to distinguish between gear types that function differently. We disagree with the board's argument that the differences between open and cooperative gear are analogous to the differences between "sport" gear and "guided sport" gear. "Sport" fisheries and "guided sport" fisheries are already distinct fisheries under the board's authorizing statute.[63] The distinction between "sport" and "guided sport" gear in the board's authorizing statute reflects the legislature's intention that the board distinguish between sport and guided sport fisheries in general. The legislature has not distinguished between open and cooperative fisheries.[64]

For these reasons, we conclude that the Chignik purse seine salmon fishery was a single fishery, and that the board did not alter that fact by making detail changes to the type of equipment used by the cooperative fishers. Both cooperative and open fishers captured the same species of salmon common to the fishery with purse seine gear. The board cannot divide what has historically been a single fishery by simply tinkering with ancillary apparatus and seine dimensions. The emergency regulation therefore authorized the board to allocate fishery resources within a single fishery, in violation of the authorizing statute, AS 16.05.251(e).

We note that the board's allocation of the harvestable salmon between the cooperative and the open fishers was potentially arbitrary and capricious. Allowing some, but not all, Chignik salmon purse seine permit holders to operate different types and amounts of fishing equipment potentially raises questions of efficiency, arbitrary decision making, and equal protection.[65] The allocation may be vulnerable to attack on the theory that under a two-subfishery system, the open fishers only have access to a small percentage of the allocation for the whole Chignik fishery.[66] Grunert contends that allowing open and cooperative fishers to use different amounts and types of equipment may violate subsec-

---

**63.** *See* AS 16.05.251(e) ("The Board of Fisheries may allocate fishery resources among personal use, sport, guided sport, and commercial fisheries.").

**64.** *See id.*

**65.** The board claims that the different equipment used by the cooperative fishers "carries important management and conservation benefits." It is not self-evident that limiting the use of net pens, fixed leads, and longer seines to cooperative fishers and denying their use to open fishers added to those management and conservation benefits. But we express no opinion about the wisdom of the board's choice to allow only some of the Chignik purse seine permit holders to use this different equipment.

**66.** This issue has not been squarely raised by the parties, although the superior court stated that the "skewed allocation percentage" dedicated to the cooperative fishers "changes the risk" for permit holders. Amici argue that it is "axiomatic in Alaska fisheries law that the Board has the authority to determine relevant distinctions and allocate between competing subgroups of users." Amici are correct to the extent we have recognized that the board may allocate between commercial and sport fishers, *Rutter v. State*, 963 P.2d 1007, 1008 (Alaska 1998); *Kenai Peninsula Fisherman's Coop. Ass'n, Inc. v. State*, 628 P.2d 897, 901–04 (Alaska 1981), driftnetters and setnetters, *Meier v. State*, 739 P.2d 172, 174 (Alaska 1987), and between resident and non-resident herring sac roe fishers in a recently developed fishery, *State v. Hebert*, 803 P.2d 863, 865 (Alaska 1990). But we have never stated that the board may divide what has historically been a single commercial fishery and allocate fish between fishers who have traditionally been treated as a single user group.

tion .150(a) of the Limited Entry Act. That subsection provides that "an entry permit authorizes the permittee to operate a unit of gear within a specified fishery."[67] "Unit of gear" is defined by the Limited Entry Act as "the maximum amount of a specific type of gear that can be fished by a person under regulations established by the Board of Fisheries defining the legal requirements for that type of gear."[68] Because only some of the Chignik permit holders could operate the maximum amount of gear, Grunert contends, the regulation unlawfully discriminated. We do not need to consider these contentions, however, because we conclude that the emergency regulation authorized an allocation of fishery resources within a single fishery in violation of the authorizing statute.

**E. We Address Other Arguments Raised on Appeal To Inform the Parties of Other Concerns We Have Regarding the Cooperative Scheme.**

**1. The emergency regulation authorized a legal entity other than a natural person to operate gear in a Commercial Fishing Entry Commission administration area.**

Grunert argues that the emergency regulation impermissibly authorized the commissioner to issue permits to the Chignik cooperative corporation. Grunert claims this authorization conflicts with the Limited Entry Act because the Limited Entry Act only allows natural persons to operate gear. The board does not refute this argument. This contention was not squarely made below, although the superior court commented on the issue without resolving it.[69] Given the likelihood the issue will arise if the legislature approves cooperative fisheries and the commissioner again issues a permit to an association and given the disruption like-ly to occur if a court were to hold invalid a cooperative permit issued to an entity that is not a natural person, we address the issue now.

The emergency regulation authorized the commissioner to issue permits to a non-person in violation of AS 16.43.140. That statute states: "After January 1, 1974, a person may not operate gear in the commercial taking of fishery resources without a valid entry permit or a valid interim-use permit issued by the commission." We have read that provision to mean that the Limited Entry Act "limits operation of gear to persons with valid entry permits."[70] The Limited Entry Act defines "person" as a "natural person"; " 'person' does not include a corporation, company, partnership, firm, association, organization, joint venture, trust, society, or other legal entity other than a natural person."[71] The emergency regulation authorized cooperative permit holders to operate fixed leads and use net pens under the conditions imposed by the commissioner's permits.[72] The commissioner's permits were issued to the cooperative as a whole, not to individual Chignik salmon purse seine permit holders.[73] Thus, fixed lead, purse seine, and net pen permits were issued to the Alliance. Although it is unclear from the record what type of organizational entity the Alliance is, it is not a "natural person."[74] Because the emergency regulation authorized the commissioner to issue a permit to operate gear to the Alliance, the emergency regulation impermissibly conflicted with AS 16.43.140.

**2. The emergency regulation did not require permit holders to "pledge" their permits.**

■ Grunert argues that the emergency regulation required "pledging" of permits in violation of AS 16.43.150(g). Although this

---

67. AS 16.43.150(a).

68. AS 16.43.990(11).

69. The court stated: "I think it's significant that the Act requires—defines permit holders in terms of persons and defines persons to be natural persons, not a variety of artificial and associational or cooperative groups." It cited AS 16.43.140(b) in support.

70. *Grunert I,* 109 P.3d at 934.

71. AS 16.43.990(7).

72. Former 5 AAC 15.358(f) & (h).

73. *See* former 5 AAC 15.358(b).

74. *See* AS 16.43.990(7).

claim was not presented or considered below, we could choose to consider it if it offered an alternative basis for affirming the superior court's ruling.[75] But we instead choose to consider it because both parties have briefed the issue on appeal and it seems inevitable that it will be raised again should the legislature grant the board authority to create cooperative fisheries.

Alaska Statute 16.43.150(g) prohibits an entry permit from being "pledged, mortgaged, leased, or encumbered in any way" except as provided in certain subsections dealing with loans. The statute does not define "pledge." Grunert argues that we should read "pledge" to mean "to promise solemnly or to put under obligation or commitment by or as if by a pledge." The board responds that "pledge" is a legal term of art that refers to personal property transferred as security for a debt, engagement, or the performance of an act.[76]

We have previously stated that AS 16.43.150(g) was intended "to allow fishermen to take advantage of the value of their permits if they no longer wish to participate in the fishery, but *to prevent the forced loss of livelihood that would result from court-ordered sales of permits.*"[77] The emergency regulation did not require permit holders to put up their permits as security. Although there was the possibility of criminal sanctions if a permit holder fished in another fishery,[78] permit holders always retained ownership of their permits. The emergency regulation did not require illegal pledging of permits.

### 3. It would be inappropriate to decide here whether the emergency regulation permitted cooperative fishers to operate fish traps.

Grunert argues that "fixed leads take on the character of fish traps, when unattached

---

**75.** *See Dawson v. Temanson,* 107 P.3d 892, 896 & n. 10 (Alaska 2005).

**76.** *See* BLACK'S LAW DICTIONARY 1153 (6th ed.1990).

**77.** *Brown v. Baker,* 688 P.2d 943, 948 (Alaska 1984) (emphasis in original).

**78.** *See* AS 16.05.722 (strict liability commercial fishing penalties for violation of regulation of board of fisheries); AS 16.05.723 (misdemeanor commercial fishing penalties).

to purse seines and vessels which are prohibited in Alaska waters." Whether fixed leads take on the character of fish traps is a fact-intensive inquiry that was never presented to the superior court. We therefore decline to consider it here on appeal.

## IV. CONCLUSION

We conclude that promulgating former 5 AAC 15.358 was not a valid exercise of the board's authority. We therefore AFFIRM that portion of the superior court's decision that held that the emergency regulation was invalid. But we REVERSE that portion of the superior court's decision that held that the emergency regulation did not involve an impermissible allocation within a single fishery. The Board of Fisheries must obtain legislative approval before adopting another cooperative scheme in the Chignik purse seine salmon fishery.

CARPENETI, Justice, dissenting.

In *Grunert I,* the court majority struck down a Board of Fisheries regulation allowing a cooperative salmon fishery in Chignik designed to address an economic crisis. For the reasons set out in my dissenting opinion in that case[1]—that this court misinterpreted the statute authorizing the regulation in question,[2] looked to the wrong statute to assess the regulation's consistency with its controlling statute,[3] and ignored the deference our case law requires us to afford to an agency's expertise[4]—I believe that *Grunert I* was incorrectly decided by this court. For the reasons set out below, I believe that even *Grunert I* does not require today's result. For both of these reasons, I respectfully dissent.

---

**1.** *Grunert v. State,* 109 P.3d 924, 936 (Alaska 2005) (Carpeneti, J., dissenting).

**2.** *Id.* at 937–39.

**3.** *Id.* at 939–41.

**4.** *Id.* at 941.

In *Grunert I* the court focused almost exclusively on what it deemed the problem of a lack of active participation by co-op members:

- it pointed to features of the Limited Entry Act that it said "reflect an intention that permit holders be, at minimum, individuals who were *actively fishing* "; [5]
- it looked to Limited Entry ranking factors and said they were designed to "protect those who *actually take fish* "; [6]
- it said "[a]ctual participation also matters when it comes to the issuance of subsequent . . . permits"; [7]
- it pointed to other provisions in the Limited Entry Act that emphasize participation, concluding that "these provisions in the Act contemplate economically dependent individuals who invest time and money in *actually fishing* "; [8]
- it found that "a central premise of the statutory scheme is that the permit holder is an individual *who will fish.*" [9]

With this backdrop, the court in *Grunert I* concluded that "[p]articipation by the individual is inherent in the limited entry permit system. The Chignik cooperative fishery scheme is fundamentally at odds with this premise because it allows *people who are not actually fishing* to benefit from the fishery resource." [10]

In response to this apparently clear set of signals, the Board of Fisheries took great pains to structure a program in which people must actually fish in order to participate. It required that each cooperative member must make at least ten landings of fish.[11] Moreover, the regulation had the intended effect: The number of cooperative members actively participating in the fishery rose from an average of twenty-one for the previous three years to seventy-six last year. Fifty of those fishers had at least fifteen landings.

But now the court subtly but drastically changes the discussion. Now the essential flaw of the cooperative system is not that fishers may be members without doing *any fishing* at all. Now the flaw is that the "regulation still allow[s] permit holders in the cooperative to benefit economically from the work of others." [12] Any board-authorized sharing of effort, pooling of resources, or cooperative venture is now deemed forbidden by the Limited Entry Act.

The court today justifies this change from *Grunert I* by the observation—true but irrelevant—that "nothing we said in *Grunert I* expressed a notion that cooperative participants could be active participants if they derived benefit from deliveries they did not make." [13] In *Grunert I* the court strongly implied that active participation—"actively fishing"; "actually take fish"; "actually fishing;" "an individual who will fish"—was the necessary but missing ingredient. Contrary to today's bald assertion that "nothing in *Grunert I* implied as much," [14] each of the quotations set out above, and others, very strongly implied that the critical flaw in the earlier regulation was the lack of active participation. That flaw unquestionably having been remedied by the regulation under consideration in today's opinion, the regulation should have been upheld.

For these reasons—that *Grunert I* was wrongly decided and that, even if *Grunert I* was correctly decided, it does not require today's result—I respectfully dissent.

### APPENDIX A

### DECISION ON RECORD

### BEFORE THE HONORABLE
### WILLIAM F. MORSE

Superior Court Judge

Anchorage, Alaska

---

5. *Id.* at 933 (emphasis added).

6. *Id.* at 934 (emphasis added).

7. *Id.* (emphasis added).

8. *Id.* (emphasis added).

9. *Id.* (emphasis added).

10. *Id.* at 935 (emphasis added).

11. Former 5 AAC 15.358(b)(7)(C).

12. Op. at 1234.

13. *Id.* at 1233.

14. *Id.*

June 2, 2005

11:04 o'clock a.m.

APPEARANCES:

FOR THE PLAINTIFFS:

(Telephonically)

ARTHUR S. ROBINSON

Attorney at Law

35401 Kenai Spur Highway

Soldotna, Alaska

FOR THE DEFENDANTS:

LANCE B. NELSON

STEVEN A. DAUGHERTY

Assistant Attorney Generals

Natural Resources Section

1031 West 4th Avenue

Suite 200

Anchorage, Alaska

PROCEEDINGS

3AN6105-92

[11:04:59]

THE COURT: All right, we are on record in *Grunert v. State,* 3AN-05-07909 Civil. Mr. Nelson is present and with—I'm sorry, with his associate. I apologize I can't remember your name.

MR. DAUGHERTY: Mr. Daugherty.

THE COURT: All right. And, Mr. Robinson, can you hear me?

MR. ROBINSON: Yes, I can, Your Honor.

THE COURT: And I know that there are a number of other people listening in telephonically. I know that there was a news reporter or media person from Dillingham. Is that person connected?

UNIDENTIFIED FEMALE SPEAKER: Yes, I am.

THE COURT: you—could you—I couldn't hear you.

UNIDENTIFIED FEMALE SPEAKER: Yes, I am.

THE COURT: Okay.

UNIDENTIFIED FEMALE SPEAKER: My name is Jody (indiscernible).

THE COURT: All right. This is the time set for the announcement of the findings after yesterday's oral argument. The first question is whether or not the regulation that the Board of Fisheries promulgated in response to the Supreme Court's decision on March 17, 2005, was a valid emergency regulation. AS 44.62.250 requires that there be a written finding that includes a statement of facts describing the emergency and articulating why the particular regulation is needed and would support the public peace, health, safety, or general welfare. It's clear that there was a written finding, there is clearly a statement of facts, and the only question is whether or not the articulation of those facts truly constituted an emergency. And we are also guided by another state statute—I think it's .70 or .270—that articulates a policy to limit the number of emergencies that should be found.

The emergency was created by the—or the purported emergency—was created by the timing of the Supreme Court's decision in Grunert that had been in litigation for several years and in front of the Supreme Court for approximately a year, which would at least suggest that the opinion was coming down, and I would perhaps surmise that the Supreme Court probably thought that it ought to get its decision out before the 2005 season, but I don't think anyone could reasonably rely on that, although that was a—would be a rational expectation that it was coming.

I think that the timing of the decision does constitute an emergency. I think that the general welfare standard is not restricted to the interests of the entire state but can be interest-can be the general welfare for a more narrow entity, in this instance the fishery which is the scope of the regulation at question, and it clearly affected everybody inside that fishery as well as the larger community that would be impacted by the regulation and that had an economic interest in the fishery itself. It's clear that the fishers reasonably assumed that the cooperative regulation was—that was in place at the time of the decision would likely be in place at the

time of the fishery, given that it was opening in the first week of June or close to that time period. And it is clear that a variety of financial, logistical, personnel, personal, and equipment arrangements would have to made by anyone who wanted to participate in the fishery. The fact that the decision came down two days after the deadline for the election to participate or not in the cooperative—it's not the fact that it came down two days after that, but the fact that that's—the deadline was March 15th suggests that the Board understood the amount of preparation that would reasonably be necessary for any participant in the fishery to plan, to get ready. I mean it takes time to make those arrangements. You can't do things quickly.

No matter what happened—no matter how the Board acted, it had to act quickly after March 17th because it had to have something in place for the June opening, and whether that was the—you know, to tweak the co-op or to replace it entirely with some other regulation, it had to act quickly. And while it might have done various other things regarding legislation prior to the Supreme Court's decision, or regulate or to attempt to get regulation during the brief period between March 17th and the expected end of the legislative session, it wasn't reasonable— I mean it was a reasonable thing to decide that was unlikely to occur. And I think that anyone who's familiar with the end of a typical legislative session knows that it is unlikely to get controversial new legislation passed so quickly, and this particular experience this session sort of proves out the general rule.

This is a contentious issue that applied— legislation that would permit the co-op would be legislation that would impact potentially the entire—all fisheries across the state, and that would be extremely contentious. It would require a lot of thought, a lot of effort, a lot of political machinations, pushing and pulling before an end legislative product would come out and likely would have resulted in a less than nuanced one. So the regulation was limited to a particular fishery that had some experience with a co-op, and the Board had experienced with the co-op, so I think it was a wiser effort on the Board's

part to pass a focused regulation that would be in place for one season and one fishery rather than to seek legislative option at that late date.

Now, on the other hand, it could have had other non co-op regulations in hand in expectation of an adverse decision, it could have had a variety of different flavor co-op regulations in anticipation, but the Board, like any agency, has scarce resources, and those efforts would have been speculative and perhaps would have been prescient and accurate but more likely would have been a fair waste of time. And also given the fact that even if they had gone through the formal process, they could have gotten a regulation out only, you know, in June on time. I think the additional delay of the formalized process would have simply hurt both sides by increasing uncertainty.

So I think that there was a legitimate emergency, and I think that the procedural requirements of the regulatory process were met. As a consequence, I think the new regulation is presumed valid, and it is incumbent upon the challenger to overcome that presumption.

There are two portions of the new regulation that were—that need to be compared to the Grunert decision. The first is the sort of one- or two-fisheries issue that depends on the definition and nature of the gear. AS 16.43.994 defines fishery in terms of a single resource, a single area, and a single type gear. And, paraphrasing, essentially the regulatory and statutory scheme says that if the same gear is being used in that resource in that area, then there needs to be regulatory—uniform regulations for the use of that gear set. And the question here is whether or not the use of the leads by the co-op and not by the—the permitted use of leads by the co-op and not by the open fishers, whether that's a sufficient change in gear to allow there to be disparate regulations applicable to the two groups. And I don't think this is a statutory construction issue. I think this is a sophisticated fishing decision where the administrative agency's expertise should be given deference by a court. It's not merely a matter of defining the word gear. That's not the issue. The real issue is the practical on-

water, you know, during the fishing experience difference between the types of equipment and the impact that equipment has.

Frankly, it seems to me that much of the equipment is identical. I mean, a purse seine is a purse seine, but that's too superficial of an analysis. The real reality is with the use of the leads, various things change. There is a slower pace. The consequences of leads is that fish which are normally traveling from point A to point B and need to be located, tracked, followed, chased, and fished during movement instead are located, at least temporarily, in a relatively small, confined space where people can fish them using the same techniques but at a different pace altogether. You can fish more slowly, you can fish more carefully, both in terms of safety, and you can fish in a way that even if you are using a purse seine in both circumstances, you're probably incurring or inflicting less damage on the product during the course of the fishing. It seems to me that the Board could rationally understand that fishing at a high pace with equipment, a purse seine, is a lot different than fishing at a more measured, leisurely pace in a restricted area. And more importantly, this gear change is not essential to, but certainly permits the cooperative fishing process that the regulations are intended to allow and encourage. It's not necessary but it certainly does allow a more cooperative fishing style.

And I think that the—essentially this regulation passes muster. I don't think that the Grunert decision itself forces a ruling—a contrary ruling. My read of the opinion is that the Supreme Court was uncertain as to the record before it—not uncertain, they knew what the record was, but the record itself was not particularly complete because there had been an amendment sort of mid-litigation, so I don't think that the decision itself precludes me at this point from finding that the regulation is acceptable or at least passes muster on that particular grounds.

That leads us to the final and critical issue, which is whether or not the Board of Fisheries exceeded its statutory authority by enacting this modified cooperative fishing regulatory scheme. I've read Grunert several times since oral argument yesterday, and I think that the—and I'll cut to the chase: I mean I think that the decision profoundly limits the ability of the Board to create a cooperative fishery. And I think that, ironically, all of the reasons that the Board opted for a cooperative fishery argues against the Board's authority to do it. It is a profoundly different style of fishing, a different arrangement, a different economic arrangement, a different—it has different impacts on the community, both the local fishers—you know, the actual permit holders themselves and the fishing community itself. And that's the exact reason why the Board thought it was necessary to enact it. The very need and success of the regulation proves that it is dramatically different than what the Act itself permits. And I will try and be more specific. There are several things.

Clearly in the old regulation, that regulatory scheme allowed a certain number of cooperative members to not fish at all, to simply stay at home and not fish. The new regulations require all the co-op members to fish a minimum of ten deliveries, and the relationship of that ten deliveries to the total number of deliveries remains to be seen. And it's—can only be sort of predicted, but we—you know, until it actually happens, we don't really know because we won't know the size of specific deliveries, we won't know the size of the run, we won't know the size of the escapement needs until the fishery actually takes place. But nonetheless, to the extent that there is more than ten deliveries times the number of co-op members, the more deliveries that take place the more likely you are going to have some number of people not exceeding ten deliveries and be essentially passive and nonparticipatory for a greater and greater portion of the particular fishery—the particular opening.

The Supreme Court clearly read the Limited Entry Act to reflect two basic criteria. One is to restrict eligibility for permits to those who would be actually fishing, and they—that's sort of the source of their description of what is active fishing and what is active participation. And also, those people who have a dependence on fishing, that's a factor in the assignment originally and, you

know, sort of post-creation of the whole limited entry scheme. The point seems to be that the Act prefers to have people actively participate and be economically dependent, not necessarily exclusively, but be economically more dependent than less, and to require active participation. And I think it's significant that the Act requires—defines permit holders in terms of persons and defines persons to be natural persons, not a variety of artificial and associational or cooperative groups.

AS 16.43.140(b) points out that—just a moment here—the number—the people who can't participate would be corporations—who can't be permit holders: corporations, companies, partnerships, firms, associations, organizations, joint ventures, trusts, societies, or any other legal entity other than an actual person. And the—another aspect that I think is significant is that it requires the holder to be the principal and to fish through his or her own efforts rather than through some sort of representational activity by another entity, with the exception of the crew, and that crew can only work when the permit holder is actually physically present on the boat and actively participating, doesn't necessarily have to be operating the gear, but has to be actively participating. And the difference that is wrought by the cooperative scheme is that these to the—once you get beyond an average of ten deliveries per co-op holder or co-op member, once you get a certain number of people who are going to choose not to do more than ten deliveries— and even if they choose to do fifty—whenever they stop fishing, whenever that group stops fishing, then they're not only absent from the boat, they are not actively participating, and they look like exactly the kind of thing that the act prohibits, which is a passive sort of financially-interested-only participant. And that's—I think that's not what the Act permits under the Grunert decision.

It does a number of things. The co-op system changes the distribution of profit and the mechanism of the sharing of profit. It constitutes a reduction of competition both within the co-op and with the non co-op members. It permits different timing of participation in the fishery by the co-op members versus the open fishers. And it permits—let me—timing is not quite the right word—a different style and pace of fishing from the limited entry model of frankly frenzied, nearly chaotic at times, competition for the fish, and whether that's wise or not it's not for me to say, but that's clearly the model the limited entry system encourages if not requires; whereas the cooperative system, which is exactly why the Board and the co-op members like it, allows for a slower paced, a more careful, less frenzied, fishing style that has a variety of other impacts downstream which hopefully require—will permit a higher—better product and a higher price. It may well be a saner system. And I mean by sane, I mean less insane system. But that's a policy decision that I am not sure the Board gets to make given the constructs of this statutory scheme.

And it also permits different openings, not only permits, it requires different openings. Because of the allocation between the open fishers and the co-op fishers, the two groups go out at different times. That's a dramatically different change than under the limited entry—any other limited entry system.

I think also the Act's use of economic dependence or anticipation of economic dependence on a fishery means that while permit holders don't have to do nothing but fish, they clearly can do things during the off-season, but during the fishing season, I think, the expectation is that will be their primary economic focus, not exclusive, but primary economic focus. The cooperative system allows some number of co-op members to essentially not fish during the season, and that's exactly the point, allowing them to be teachers, be—you know, do anything else, whatever that might be. And that clearly distorts the allocation model under the limited entry system.

It also—this co-op system also changes the risk that a permit holder has when he or she goes out to fish. Just using some rough examples that coincidentally are fairly close to the actual situation in this particular fishery, assuming that there is 100 fishers in the fishery and 80 co-op members and 20 open fishers, and because of the skewed number—

the skewed allocation percentage, let's say 75 percent of the fish are guaranteed to the co-op members and 25 to the open members. No matter what the pace, no matter what their participation, assuming that they've delivered over 10, every co-op member is going to be, as I understand it guaranteed 75 over 80 because they're going to be sharing that regardless of their actual participation in the fishery. Once they get over the minimum, they're going to share the profits at that percentage, and everyone sort of knows that, and there is a real advantage to that. There's a—I mean, that's part of the goal of the co-op. On the other hand, the—and there is a guarantee that the 75 percent of the fish are delivered by the co-op. Within— so there is an allocation both between co-op and the open folks.

Within the open group, none of those members has any guarantee whatsoever, yet they are limited to a smaller total catch, probably a fewer number of deliveries, and a smaller number of—lesser opportunity to average out the impact of any particular, you know, good days and bad days. In the open world if they had access to 100 percent of the catch, they could have couple of bad days and some good days, and it would average out, and they would get a varied percentage of the total catch. But now those 20 open fishers are going to be competing for a smaller total pot, there is a greater chance that they won't move to an average, and there is an increased risk of great disparity within those 20. Somebody is going to hit a home run in that open group and catch a lot of fish on a couple of—you know, on one day or a couple of sets and is going to pull a large percentage of the open allocation to that one boat or the one holder and limit the opportunity of the remaining open people, thus restricting their ability to fish even more than the allocation between the co-op and the open fishers does already.

I think that it changes sort of the economic model in another sort of more fundamental way as well. Under the limited entry system, holders who don't do well for whatever reason—bad luck, bad judgment, bad finances, bad equipment, who knows—are go-ing to economically suffer, and ultimately their option is to—you know, their end game is to sell the permit, get out of the fishery, and some new entrant will arrive on the scene. Under the co-op system, those who for whatever set of reasons are less able to succeed economically will rationally opt to participate as minimally as possible. Ten deliveries only and then they stop. That permit remains in their hands and new people don't come in, whether those are new people from the local community or from Anchorage or from Seattle, that doesn't matter, but there is going to be less turnover. That may be a wiser system. I'm not making a judgment as to which is better, but they are clearly different, and the first is the one that is set up by the Act, and I think the second system is not permitted by the Act. Perhaps that should be changed, but that's not my call.

The old system also encourages more boats, more equipment, a greater, more expanded support system of equipment providers, bankers, people who sell food, people who ship stuff to the Bush so that they can feed the crew members, probably a greater number of crew members as well. It is also true that that support system is probably more fragile and more prone to collapse because there's a lot of credit out there, there is a lot of risk being taken, and somebody's going to fail and the system will tumble, and that's clearly why the co-op system is being sought as a response to the problems that have already been faced, not only by the permit holders who have opted for the co-op system, but also for the Chignik community in general.

And again, it may be a rational way to spread the economic risk, but given the Supreme Court's decision in Grunert and its articulation of the requirements, policies, goals, participatory, and economic model of the limited entry system, I do not—I cannot find that the modifications to the co-op regulations—that this new reg to the co-op system that this new regulation has enacted satisfies the problems identified in Grunert. So I find that the new regulation exceeds the authority of the Board of Fisheries and is invalid.

. . . .

**END OF REQUESTED PORTIONS**

## APPENDIX B

### Order

Before: Bryner, Chief Justice, Matthews, Eastaugh, Fabe, and Carpeneti, Justices.*

The court, having considered the arguments on appeal and cross-appeal, and having heard oral arguments on February 3, 2006, and having previously ordered that the appeal and cross-appeal be expedited,

IT IS ORDERED:

1. We issue this order now so the parties can guide themselves accordingly prior to the 2006 Chignik commercial salmon season. An opinion will follow.

2. In *Grunert v. State (Grunert I )*, we struck down former 5 Alaska Administrative Code (AAC) 15.359 (2002), a Board of Fisheries regulation that created a cooperative fishery within the Chignik salmon fishery.[1] Following publication of *Grunert I* in March 2005, the board, invoking its authority under AS 44.62.250, found that the timing of the publication of our decision created an emergency because some of the cooperative fishery members did not have enough time to prepare for the 2005 fishing season. The board then promulgated an emergency regulation that maintained the cooperative fishery scheme but required each cooperative permit holder to "actively participate" in the fishery by making at least ten deliveries during the fishing season.[2] The emergency regulation also permitted the cooperative fishers to use types and amounts of equipment different from those which open fishers could use in the Chignik salmon fishery.[3] Grunert and other commercial fishers (collectively, Grunert) brought suit in the superior court against the State of Alaska, Alaska Board of Fisheries, and Alaska Department of Fish and Game (collectively, the board). In his

oral decision, Superior Court Judge William F. Morse decided that (a) the timing of our decision in *Grunert I* created an emergency; (b) the board met the procedural requirements for promulgating a regulation in response to that emergency; (c) the cooperative and open Chignik salmon fisheries are two distinct fisheries because they operate with different types of gear; and (d) per *Grunert I*, the emergency regulation was invalid because it exceeded the board's statutory authority. Judge Morse reasoned that, even with the ten-delivery requirement, the emergency regulation was still "dramatically different" from the fishery regime envisioned by the Limited Entry Act as *Grunert I* described it.

3. On appeal, the board argues that *Grunert I* only identified one fatal flaw in the cooperative scheme—the lack of any requirement of meaningful, active participation by each member of the cooperative fishery. The board maintains that the emergency regulation adequately addressed that flaw by requiring all cooperative fishers in the Chignik salmon fishery to make at least ten deliveries during the commercial fishing season. The board also argues that even though the emergency regulation has expired, we should consider these issues under the public interest exception to the mootness doctrine.

4. On cross-appeal, Grunert argues that the cooperative and open fisheries are not distinct fisheries, and that the emergency regulation therefore impermissibly allocates fishery resources within a single fishery. Grunert also argues that the emergency regulation is invalid because it allows cooperative fishers to operate fish traps; it requires permit holders to "pledge" their permits in violation of AS 16.43.150(g); and it authorizes a legal entity other than a natural person to operate gear in violation of AS 16.43.140(a). Grunert also argues that the timing of our decision in *Grunert I* did not justify the board's finding of an emergency.

---

* Carpeneti, Justice, dissents from this order. His dissent is attached.

1. *Grunert v. State (Grunert I )*, 109 P.3d 924 (Alaska 2005).

2. Former 5 AAC 15.358(b)(7).

3. *Compare* former 5 AAC 15.358(f)-(h) and 2005 Chignik Management Area Commissioner's Permit Cooperative Salmon Fixed Leads, § 4(a) *with* 5 AAC 39.260, 39.240, 15.332(c).

5. Because the 2005 emergency regulation has expired, whether there was an emergency is now a moot issue. We decline to invoke the public interest exception to review this issue. But we do find the public interest exception applicable to the remaining issues raised on appeal and therefore address them on the merits.

6. The Board of Fisheries emergency regulation, former 5 AAC 15.358, was not a valid exercise of the board's authority. The Chignik cooperative fishery scheme permitted by the emergency regulation was fundamentally at odds with the Limited Entry Act. Although the ten-delivery requirement mandated some significant participation by each participating permit holder, the emergency regulation still allowed permit holders in the cooperative to benefit economically from the work of others. If the board wants to implement a cooperative regime, it must seek legislative approval first. Our instruction in *Grunert I* to this end is applicable here: "Before this regulatory scheme accomplishes such radical departure from the historical model of limited entry fisheries in Alaska and the spirit of the Limited Entry Act, ... we conclude that the legislature must first authorize the board to approve cooperative salmon fisheries." [4] The legislature might conclude that a cooperative Chignik salmon fishery is desirable and that the board should have authority to approve cooperative commercial fisheries. But because it has not yet done so, the emergency regulation was not authorized by the Limited Entry Act.

7. We address more briefly these other issues:

(a) The emergency regulation authorized a legal entity other than a natural person to operate gear in a Commercial Fishing Entry Commission administration area, in violation of AS 16.43.140.[5] Under the Limited Entry Act, only "natural persons" with valid entry permits may operate gear.[6]

(b) At oral argument on appeal, Grunert asserted that the board's cooperative system arbitrarily allocates the Chignik salmon catch between the open and cooperative fishers. The superior court suggested that, under the cooperative system, the open fishers only have access to a small percentage of the allocation to the whole Chignik fishery. But this issue has not been squarely addressed by the parties' briefs. We therefore will not decide it here.

(c) We conclude that the cooperative system does not require "pledging" of permits, and that it therefore does not violate AS 16.43.150(g).

8. In conclusion, we AFFIRM that portion of the superior court's decision that held former 5 AAC 13.358 invalid, and therefore AFFIRM the judgment. An opinion of the court will follow.

Entered by direction of the court.

Clerk of the Appellate Courts

/s/Marilyn May

Marilyn May

CARPENETI, Justice, dissenting.

In response to this court's decision in *Grunert I*, an opinion that contained no explicit prohibition on all cooperative fisheries,[7] the board drastically restructured the Chignik cooperative. It did so to meet this court's stated concern that "a central premise of the statutory scheme is that the permit holder is

---

4. *Grunert I*, 109 P.3d at 936.

5. *See id.* at 934 (explaining that AS 16.43.140(a) limits operation of gear to persons with valid entry permits).

6. AS 14.43.990(7).

7. Nowhere in the opinion did the court in *Grunert I* hold all co-op forms to violate the Limited Entry Act. Rather, *Grunert I*, in its holding, stated:

The co-op regulation ... transforms the limited entry permit from what used to be a person-

al gear license into a mere ownership share in a cooperative organization.... Before *this* regulatory scheme accomplishes such radical departure from the historical model of limited entry fisheries in Alaska and the spirit of the Limited Entry Act, however, we conclude that the legislature must first authorize the board to approve cooperative salmon fisheries.

109 P.3d at 936 (emphasis added). Because the new regulatory scheme has completely abandoned the "mere ownership share" model that *Grunert I* found lacking, the new scheme is consistent with *Grunert I*.

an individual who will fish." The board established a program that requires every co-op member, in order to share in the co-op's proceeds, to fish: In order to qualify, a member must make at least ten landings. The change had dramatic effect: In 2005, under the new regulation, seventy-six co-op members made deliveries of fish, and fifty of them had at least fifteen deliveries.[8]

Now this court says that this dramatic change is not enough. In a decision that will probably doom several other cooperative fisheries (though without any briefing by the parties or consideration by the court at all), the court utterly strips the board of power to use a proven and effective tool in dealing with the critical problems it faces in managing Alaska's fisheries. I previously expressed my disagreement with the court's earlier decision that the former co-op regulation violated the Limited Entry Act.[9] I adhere to those views now. But even assuming that *Grunert I* was correctly decided, it should not be read to require today's decision. I respectfully dissent.

cc: Supreme Court Justices

Judge Morse

Trial Court Clerk

Distribution (by fax & mail):

Lance B. Nelson fax: 279-2834

Asst Attorney General

1031 West Fourth Avenue, Suite 200

Anchorage AK 99501

Arthur S Robinson fax: (907)262-7034

Robinson & Associates

35401 Kenai Spur Highway

Soldotna AK 99669

Gregory F Cook fax: (907-5848)

Attorney at Law

P O Box 240618

Douglas AK 99824

---

8. Only an average of twenty-one co-op members made deliveries in the three previous years, when the former regulation was in effect.

9. *Grunert I*, 109 P.3d at 936–42 (Carpeneti, J., dissenting).